**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,     :
                          :
          Plaintiff,        :
                          :    Case No. 07-062
     v.                  :
                          :    Judge John D. Bates
JOSEPH FOLEY,           :
                          :
         Defendant.     :

**DEFENDANT FOLEY'S SENTENCING
MEMORANDUM IN AID OF SENTENCING**

      The Defendant, Joseph Foley, by and through counsel, files this memorandum to aid the Court in his sentencing scheduled for July 6, 2007.

**I.     INTRODUCTION AND SENTENCING REQUEST.**

      The adjusted offense level computed under the advisory Sentencing Guidelines as outlined in the Presentence Investigation Report ("PSR") is a 19.  This offense level of 19 *suggests* a sentencing range to the Court of 30-37 months incarceration.  This adjusted offense level is primarily derived by application of the fraud loss table set forth in U.S.S.G. Section 2B1.1(b).  Notably, here, however, this offense level does not result from the application of traditional concepts of how "loss" is defined in paragraph 3 of the Application Notes to U.S.S.G. Section 2B1.1 (2002 Manual) as "the reasonably foreseeable pecuniary harm that resulted from the offense."  Rather, since the parties agreed that the loss under these particular circumstances could not be reasonably determined, the parties agreed to apply Application Note 2(B) which provides that "*the court shall use the gain that resulted from the offense* as an alternative

measure of loss only if there is a loss but it reasonably cannot be determined." (Emphasis added).

To be very clear here at the outset, Mr. Foley knowingly and voluntarily pled guilty and fully acknowledges and accepts responsibility for the criminality in which he engaged. Further, Mr. Foley acknowledges that he agreed to use the $1.2M figure for the Guideline's loss computation purposes. Thus, in light of reaffirming his unequivocal acknowledgement of those two premises that comprise the basis for his guilty plea, in the presentation of his arguments in this submission, Mr. Foley wants to be very clear that his arguments herein are not intended to, and should not be misconstrued in any way, to be contrary to those two major premises. Mr. Foley agreed to plead guilty in this case because he is guilty. He also agreed to plead guilty as a mechanism towards moving forward to avoid a certain indictment and trial, and to attempt to cooperate with the government to bring finality to this matter in an expeditious and efficient matter. Nevertheless, at the time of his entering into his Plea Agreement, and now that he is facing the consequences and punishment of sentencing, Mr. Foley was confident and hopeful that the Court would consider relevant facts and mitigating circumstances about the computation of the loss figure and other relevant factors in determining a just sentence rather than simply applying the loss computations to the sentencing table in a mechanical and casual matter. Defendant Foley believes these facts support a major deviation from the sentence suggested by the Guidelines relating to this amount of loss towards the Court's determination of a sentence that the Court believes is sufficient, but not more than necessary, and that is in accordance with all of the other sentencing objectives of 18 U.S.C. Section 3553(a)(2).

Pursuant to the terms of the Plea Agreement, the "parties agreed that the government can prove that the gain to the defendant was approximately $1.2M." Plea Agreement, par. 3. The

Defendant does not dispute that the government can prove this because he did in fact receive the *gross* amount of $1.2M from his employer. However, the Defendant wants to ensure that the Court understands that this amount has no direct, or even a casual connection to Mr. Foley's offense conduct, be it in quantifying either loss or gain, as those terms are defined under the fraud loss table. Rather, Mr. Foley received this gross amount from his employer as his share of the company's accumulated profits as a participant in its profit sharing plan. While Mr. Foley agreed to the use of this figure for the loss computation, he wants to make it clear exactly what it is and the origin of this figure and that it is not based upon the illusory premise that this amount represents the benefit he received as a result of his admitted criminality. That is simply not the case. There exists no evidence or admission by Mr. Foley that the $1.2M figure was either a loss incurred by victims of the offense or gained by Mr. Foley as a direct result of his criminality.

Even with a structure like the Guidelines that is arguably designed to assure uniformity in sentencing rather than to foster sentencing on an individualized case by case analysis, since punishment is directly correlated to the amount of loss/gain dollars, a rationale loss/gain figure should have some nexus or connection to either the loss actually sustained or the benefit actually received as a result of the criminal conduct. This does not exist here and this fact was hardly acknowledged in the PSR's application of it to the Guidelines in this case.

At first blush of this analysis, it might be concluded that this loss/gain nexus or connection analysis is unnecessary or irrelevant at this point since Mr. Foley agreed in his Plea Agreement that the government can prove that the gain to the Defendant was approximately $1.2M and agreed that this gain figure is to be used for application of U.S.S.G. Section 2B1.1(b). Stated differently, since the Defendant agreed to use this figure towards the computation of the adjusted offense level for the Guideline's sentencing determination instead of insisting upon the

government's proof and quantification of an actual loss figure (which amount might very well be zero, was presently undetermined, and difficult to prove), that this was his negotiated bargain and he should be stuck with it for sentencing purposes as he understood the application of the Guidelines and the potential sentence of thirty (30) months imprisonment when making this agreement. It is the Defendant's position that that is not the case. While he agreed that he in fact received the $1.2M from his employer, he has always maintained that that figure has absolutely no nexus to quantifying his criminality, even under the Guideline's structure. Further, since the Defendant did receive this amount and was willing to admit his criminality, he viewed his Plea Agreement as a mechanism towards moving forward to admit his criminality and bringing finality to this matter. Most importantly, in agreeing to this, he reasonably relied upon the post-Booker sentencing structure as allowing the Court to readily see through the illusory nature of this amount and to apply its sentencing experience towards rendering a fair and equitable sentence, considering this and other factors in this case. He certainly did not bargain for, or irrevocably agree to, a minimum of thirty (30) months incarceration.

Thus, in fashioning a sentence in this case that is "sufficient but not greater than necessary" to comply with the purposes of punishment set forth in 18 U.S.C. Section 3553(a)(2), Defendant Foley implores the Court to thoroughly examine and consider the arbitrary nature of this loss/gain figure used in this case. Defendant Foley requests that the Court attempt to measure the true extent and degree of his criminal culpability in this conspiracy with other factors, including the criminality and punishment of his co-conspirators[1] and impose a sentence

---

[1] Mr. Foley's co-conspirators are Michael Hoover, Case Number 07-20, and John Baggett, case number 07-21. Mr. Hoover and Mr. Baggett reported to Mr. Foley at American Electric Power ("AEP"). Mr. Hoover pled guilty to one count of filing false information intended to affect the price of natural gas in violation of the Commodity Exchange Act, 7 U.S.C. section 13(a)(2). Mr. Baggett pled guilty to one count of conspiracy to provide false price information that may affect the price of a commodity in violation of 18 U.S.C. Section 371. Importantly, in these related cases, the "loss" was computed in the same manner as that for Mr. Foley except for Merrs. Hoover and Baggett, since they were not participants in the phantom profit sharing plan, their "gain" was computed on the basis

that is in line with the ends of justice. In this particular case, it would be an "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guidelines calculations can visit on human beings if not cabined by common sense" if the Court casually accepts this figure as a nexus to the Defendant's criminality and blindly applies the resulting advisory guideline adjusted offense level to the suggested incarceration table and sentences the Defendant on that basis. *See*, <u>United States v. Adelson</u>, 441 F. Supp.2d 506, 507 (S.D.N.Y. 2006).

In recognition of this problem in this particular case, Defendant Foley requests that the Court determine an equitable sentence by either, (1) appropriately discounting the application of the fraud loss computation in this case and determine an appropriate sentence for Defendant Foley in line with the §3553 purposes and in recognition that no loss was sustained here nor was there any benefit to Mr. Foley as a direct result of his criminality; (2) utilize the Guidelines structure and the loss in excess of $1M figure for determination of the U.S.S.G. Section 2B1.1 computation but then apply U.S.S.G. Section 5K2.0(a)(2) to substantially depart downward from that offense level on the basis that that computation requires mitigating circumstances of a kind and to a degree not contemplated by the Guidelines; (3) on the basis that the Court consider using the net amount that Mr. Foley ultimately received, which amount is less than $120,000, for computation of a guidelines sentence; or (4) any combination of the above. If the Court decides to utilize any of these options, Defendant Foley further requests that the Court then factor in the additional §3553 factors in arriving at an ultimate sentence. Each of these options are discussed in more detail in Section VI hereof.

---

of bonuses they each obtained during their employment at AEP of greater than $70,000 for Mr. Baggett and greater than $120,000 for Mr. Hoover. See, Baggett and Hoover Plea Agreements. Before application of recommended Section 5K1.1 credit in both cases, Mr. Baggett and Mr. Hoover's adjusted offense levels were 12 and 13. The court recently sentenced both Mr. Hoover and Mr. Baggett.

Additionally, in addition to the collateral consequences associated with a felony conviction, Defendant Foley requests that in its determination of an appropriate sentence that the Court take into consideration other factors relating to severe sanctions and consequences that he has already suffered relating to his criminal conduct. He was abruptly terminated from his position as an energy trader at American Electric Power Company ("AEP") in Columbus, Ohio in October 2002. In September 2005, the U.S. Commodity Futures Trading Commission ("CFTC") filed a complaint against him in the federal district court in Columbus, Ohio alleging violations of the Commodities Exchange Act and seeking civil monetary penalty, injunctive and other relief. Mr. Foley settled this suit in September 2006 on terms of his paying a $350,000 fine and agreeing to be permanently prohibited from applying for registration or engaging in any activity requiring such registration, or acting as a principal of any registered entity required to be registered. This resolution and agreement limits his future employment opportunities in his field. It precludes him from being able to obtain employment as a commodities trader with a public company or as a futures advisor. He had to liquidate all of savings and funds set aside for his children's educations to pay this fine.

Additionally, although he was vested in AEP's phantom profit sharing plan and met all of its qualification requirements for distribution of the $2.2M he was entitled to under the plan, in April 2003, Mr. Foley was forced to initiate and endure very contentious litigation against AEP in federal court in Columbus, Ohio to attempt obtain these funds. After substantial contentious litigation efforts and costs, this matter was ultimately settled in December 2006 in the middle of the trial with AEP agreeing to pay him $925,000, twenty five percent of which went to his attorney, netting him $685,000.

Finally, the toll all of this has had on him and his family is almost immeasurable. He lost several jobs over the last several years and has had to relocate and move his wife and two young boys several times during this time and had to endure the CFTC and AEP litigation matters and the defense to this criminal matter. Lastly, his wife was recently diagnosed (March 2007) with cervical cancer and underwent radiation and chemotherapy treatments. Her prognosis is still uncertain. This has drained her of energy and renders her unfit for work and physically unable to support herself or the children. She has had to endure that very heavy burden on top of all of the anxiety and uncertainty over the past several years in dealing with all of the matters related to AEP. Thus, there could hardly be a more important time for Mr. Foley to be there for the welfare of his family.

Considering the issues related to this loss computation, application of U.S.S.G. Section 5K2.0, and consideration of the Section 3553 factors, Mr. Foley respectfully requests that if the Court determines it appropriate that his sentence include a term of incarceration, that the Court conclude that any term of incarceration be served by home confinement via electronic monitoring as opposed to correctional facility incarceration that must be served away from his family, community, and employment. The Defendant submits that this type of sentence is sufficient, but not greater than necessary, it is in line with his criminality, and that it comports with the purposes of sentencing and Section 3553 mandates and would appropriately punish Mr. Foley for his criminal conduct. Mr. Foley has twenty years of experience trading commodities; sixteen years in the grain business and four years at AEP trading natural gas. Just last year in October 2006, Mr. Foley was extremely fortunate to obtain an ideal employment opportunity for him back in the grain business with a privately owned Rotterdam company working in its Chicago office as a exporter of U.S. grain. This position allows him to utilize his very substantial

trading experience in the grain business. The long and the short of it is that given this felony conviction and the CFTC injunction, there are very, very few job opportunities still available to him to use his background and skills to provide for his family. His current employer is behind him and willing to stick with him. However, if he is required to leave his job to serve an incarceration term, he will undoubtedly be replaced and he will lose his job. Requiring Defendant Foley to serve an incarceration term in a correctional facility in this particular case, when incarceration alternatives are available that impose virtually the same punishment, will have no beneficial effect on Mr. Foley whatsoever (considering Mr. Foley's characteristics) and would serve no societal function or goals of sentencing. On the other hand, however, this type of sentence would allow Mr. Foley to maintain his current employment to provide the financial stability and assistance in raising his family.

## II.    THE SENTENCING STANDARD  -  18 U.S.C. §3553(a) FACTORS.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court invalidated the mandatory use of the Sentencing Guidelines and declared them "effectively advisory." Following Booker, the Court must impose a sentence in accordance with 18 U.S.C. Section 3553(a), and should no longer presume that a sentence calculated pursuant to the Guidelines is appropriate. United States v. Pickett, 475 F.3d 1347 (D.C. Cir. 2007). Section 3553(a) instructs District Courts to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth in that Section. United States v. Foreman, 436 F.3d 638 (6th Cir. 2006). A District Court's job is not to impose a "reasonable" sentence as district courts should not be concerned with reasonableness, as this standard applies only to appellate review of a defendant's sentence. Rita v. United States, 551 U.S. ___ (2007)(presumption of reasonableness if sentence is within Guidelines range is an appellate court presumption. The sentencing court does not

enjoy the benefit of a legal presumption that the Guidelines should apply); Unites States v. Foreman, 436 F.3d 638, 644 n.1 (6th Cir. 2006). Rather, the sentencing court should be focused on properly considering the relevant §3553(a) factors and providing a thorough explanation of its application of those factors to the particular defendant's individual circumstances and impact on its ultimate sentencing decision in order to allow for thorough appellate review. Rita v. United States, Id. Thus, while the Guidelines remain important, they are now just one of the numerous factors that a District Court must consider when sentencing a defendant. See, e.g., United States v. Webb, 403 F.3d 376 (6th Cir. 2005) ("while District Court must still give some consideration to the appropriate guidelines range when making a sentencing determination, a court is no longer bound by the applicable Guidelines.").

Section 3553(a) mandates that the District Court consider: (1) the history and characteristics of the defendant; (2) the nature and circumstances of the offense; (3) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) to protect the public from further crimes of the defendant; (5) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the kinds of sentences available; (7) the appropriate advisory guideline range; (8) any other pertinent policy statement issued by the sentencing commission; (9) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (10) the need to provide restitution to any victims of the offense.

Thus, after Booker, the court must view sentencing and reconcile the tension between uniformity of sentences so that persons engaged in similar criminal conduct are treated alike (consideration of the advisory guideline range) and the fact that people are different and

everyone's situation is unique (application of §3553 factors). The sentence is premised on both of these things, an accurate calculation of the guidelines range and an independent and reasoned judicial determination that a sentence within that range accords with the §3553(a) factors. Buchanan, Id. (Sutton, J., concurring, p. 736).

## III.     GUIDELINES' LOSS/GAIN COMPUTATION.

### A.     Participation in AEP's Phantom Profit Sharing Plan.

Mr. Foley was notified of his acceptance into AEP's Phantom Profit Sharing Plan in the first quarter of 1999, retroactive to his start date at AEP in September 1998. This plan was designed by AEP to be a long term incentive plan based upon a cumulative pool of a portion of the company's earnings generated from a wide variety of energy trading such as electricity trading, gas trading, coal trading, and structured long term marketing deals (mostly electricity). Mr. Foley's participation percentage was fixed at .15% (.0015) at the time of his initial qualification to participate in the plan. His qualification percentage never changed. This plan did not require Mr. Foley to contribute any funds, assure any profitability of the company, or perform to a certain profitability level. Rather, its only stipulation was that he not be fired for cause prior to July 2002, the termination date of the plan. While Mr. Foley does not have a precise breakdown of the origin of the revenue contributions to this plan, he estimates that less than twenty five (25%) of the total contributions to this plan came from the entire gas group. Moreover, his desk's contribution of that percentage was fractional and maybe five to ten percent of that from his gulf coast desk. However, there exists no evidence that could demonstrate that any of that profitability had anything to do with or was generated to any degree by this false reporting practice. Mr. Foley's participation in this plan covered an approximate four year

period, beginning in 1999 (but covering him basically from his start date in 1998) through July 2002.

AEP paid out over $200M from this plan in 2002. Mr. Foley was entitled to his total share being paid to him in July 2002. However, instead of taking this cash at that time, he elected to defer the payout to him (and taxation) of the maximum amount of 90% of his share. As a result, although he was entitled to an immediate payout of the full $2.2M, he elected to have only $200,000 of his total share distributed to him in 2002. The balance was maintained in the plan.[2]

## B.     Civil Suit Against AEP to Attempt to Recover Profit Sharing Proceeds.

When AEP terminated Mr. Foley in October 2002, it refused to pay over and distribute his profit sharing funds to him. To attempt to obtain these, in April 2003, he was forced to bring suit against AEP in federal district court in Columbus, Ohio, being Case No. 03-CV-328. AEP countersued. The case was very contentious and costly. As an indication of this, Mr. Foley incurred legal fees up to the time of trial of $232,000. In the middle of trial almost three years later and in November 2006, the parties settled the case. AEP agreed to pay Mr. Foley $925,000. Of this amount, his trial attorney was entitled to a 25% contingency fee, plus expenses, with Mr. Foley netting $685,000.

## C.     Commodity Futures Trading Commission Lawsuit Against Mr. Foley.

In September 2005, the Commodity Futures Trading Commission ("CFTC") initiated a complaint against Mr. Foley alleging violations of federal commodity laws for attempted manipulation and false reporting of national gas prices relating to the underlying facts comprising the criminal conduct in this case. This, of course, is the civil component of this case.

---

[2] Ironically, if Mr. Foley understood that he was involved in almost daily criminality at this point in time, he would not have agreed to leave his funds with the Company with the risk that he could be terminated for cause?

This case was captioned <u>CFTC v. Joseph Foley</u>, U.S. District Court, Southern District of Ohio, Case No. 2:05-CV-849.  The CFTC sought a permanent injunction and monetary damages against Mr. Foley.  Mr. Foley incurred substantial legal fees (approximately $100,000) in defending that litigation.  Ultimately, Mr. Foley settled the case by Consent Order of Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief filed on September 28, 2006.  Mr. Foley agreed to and did pay a $350,000 fine to the CFTC.

     **D.**     <u>**Loss Computation.**</u>

It is this $925,000 amount received from the lawsuit settlement, plus the $200,000 amount that was previously distributed to him, that comprises the in excess of $1M used for the loss computation that Mr. Foley acknowledges he received.  As set forth on page 2 of the January 30, 2007 Plea Agreement, the parties agreed that the loss in this case could not be reasonably determined.  The fact of the matter is that there is no evidence that this false reporting had any affect at all on AEP's earnings or profitability, or that it had any impact on the market indices of gas.  While the government represented that it could and would have proven some impact on the price of natural gas and an actual loss, assuming a loss could be proven, this would have been extraordinarily difficult to prove and likely very expensive.  Thus, the loss or gain could very well be zero.  As a result, the parties agreed that the court shall use the gross gain that he received from AEP's profit sharing plan.  In this regard, the parties ultimately agreed that the government could prove that the gain to the defendant was approximately $1.2M.  This $1.2M is in fact the gross gain to Mr. Foley from this plan.

This is simply an arbitrary figure in that Mr. Foley (i) did not receive this gross amount and, more importantly, (ii) it has no nexus or connection in any way to any amounts he received

or derived as a direct result of the criminality he has admitted he participated in. This figure does not represent the "gain" to Mr. Foley as a result of his criminal conduct.

Furthermore, even if we assume that the profit sharing amount did have some relation to his criminality, he certainly did not gain $1.2M. Specifically, as set forth in the chart below, as a result of all of this litigation, Mr. Foley came away from all of the controversies related to this matter with the following payments and legal fees:

| Amount | Item |
|---|---|
| **$885,000** | AEP litigation net settlement of $685,000, plus $200,000 previously distributed from plan. This is based upon a gross settlement of $1,125,000 comprised of $200,000 distributed from the plan to Mr. Foley and $925,000 from this lawsuit settlement. |
| [$350,000] | CFTC fine paid |
| [$232,000] | Legal fees paid to Schottenstein, Zox & Dunn related to AEP case representation |
| [$100,000] | Legal fees paid to Schottenstein, Zox & Dunn for CFTC representation |
| [$ 13,000] | Straus & Boies legal fees |
| [$ 30,000] | Legal fees Boies, Schiller & Flexner |
| [$ 1,000] | Legal fees Larson & Nierling |
| [$ 17,000] | Expert witness fees paid through Schottenstein, Zox & Dunn |
| [$ 14,481] | IRA penalty for early withdrawal to pay CFTC fine |
| | |
| **$757,481** | **Total expenses** |
| **$127,519** | **Balance remaining** |

Thus, as is made clear by this illustration, Mr. Foley hardly "benefited" from his criminality or even his association with AEP. Through all of this controversy, after taxes paid on the profit sharing plan award and fees related to this matter, he lost money.

**IV.    OJECTIONS TO PRESENTENCE INVESTIGATION REPORT ("PSR").**

The Probation Officer issued her initial PSR dated May 23, 2007. By letter dated June 6, 2007, the Defendant timely provided the Probation Officer a written statement of his initial comments and objections. A copy of the Defendant's June 6, 2007 letter is appended hereto as

Exhibit A.  The Probation Officer issued her final PSR on June 22, 2007.  In apparent agreement with most of the Defendant's comments, many of his comments were incorporated in the final PSR.  However, several of the Defendant's comments outlined in his June 22, 2007 letter that were made to correct inaccuracies or misstatements were not incorporated in the final PSR.  Since the Defendant continues to believe that these statements are inaccurate, these are set forth below for purposes of correcting these at the sentencing hearing.  The Defendant anticipates that these were oversights and will be readily agreed to and corrected for a final accurate report.

With those corrections and with one additional major exception, the Defendant agrees that the PSR is an accurate and a fair representation of the offense, offense conduct, Mr. Foley's personal and family characteristics, and financial condition.  However, the Defendant's most significant objection is the computation of the adjusted offense level with the use of the gross amount he received from his employer's profit sharing plan without any discussion of any mitigating circumstances warranting a downward departure under U.S.S.G. Section 5K.2.0, 18 U.S.C. Section 3553, or any other theory.  Rather, while it must be quite clear that this figure has no nexus at all, there is little comment of its application in the PSR of any discussion of a potential U.S.S.G. Section 5K2.0 downward departure within the Guidelines structure, or a reduction of the adjusted offense level as a result of the application of the Section 3553 factors outside the Guidelines structure to the facts of this case.[3]

These continuing objections to the PSR will be addressed in reverse order with the continued factual inaccuracies being addressed first under subparagraph A and the substantive concerns regarding computation of and application of the adjusted offense level addressed in subparagraph B.

---

[3] Aside from the comments and objections set forth in the Defendant's June 6, 2007 letter to the Probation Officer, there was no further dialogue between the Defendant and the Probation Office towards the completion of the final PSR.

A.    **Factual Inaccuracies to the Final PSR.**

1.    **Mrs. Foley's Health Diagnosis.**  In paragraph 35 of the final PSR, it provides that in addition to Mrs. Foley being recently diagnosed and undergoing treatment for cervical cancer, that Mrs. Foley also has throat cancer.  As set forth in paragraph 3 of counsel's June 6, 2007 letter, Mrs. Foley does not have throat cancer.

2.    **Profit from Sale of Columbus, Ohio residence.**  On page 10 of the final PSR under the Equity and Other Assets, it continues to list as an asset the profit from the 2003 Foley's sale of their residence in Bexley, Ohio at $140,000.  This is also noted on page 15 of the PSR as an objection that is noted for the record that the Defendant's position may be correct but that proper documentation must be presented to correct this.  The Defendant will get documentation to the Probation Officer which will show that the residence was purchased for $575,000 and sold for $600,000 and that a loss was incurred on the transaction since the Foleys had to pay a $13,000 mold eradication fee and broker commissions out of the proceeds.  Thus, the reference that this is an asset should be eliminated.

3.    **Payment of 2006 Tax Liabilities.**  Paragraph 58 of the PSR provides that Mr. Foley's 2006 federal and state tax liabilities have not been paid.  These have been paid.

B.    **Computation and Utilization of the Loss Figure.**

In the Defendant's June 6, 2007 written comments/objections to the initial PSR, he objected to the application of the loss/gain figure to the computation of the adjusted offense level and its application to the resulting suggested sentencing range without any consideration of mitigating factors as a result of using this arbitrary figure.  The Defendant's comments start in paragraph 2 on page one and continue through page 4.  The Probation Officer's only response to this was adding new paragraph 13 to the final PSR which states as follows:

"According to the terms of the plea agreement, the loss amount was derived from the amount of money the defendant received from the employer as a bonus as a result of his criminal actions in the instant offense. Counsel for the defendant submitted preliminary comments to this report on June 6, 2007, and noted that although the defendant agreed to the amount of loss, feels it is an arbitrary figure because Mr. Foley did not receive this amount and it has no nexus or connection to any amount he received or derived as a direct result of the criminality he has admitted he participated in. Counsel wanted the record to be very clear that these figures do not represent the "gain" to Mr. Foley as a result of his criminal conduct."

Although the Defendant was willing to acknowledge and agree that he in fact received a gross amount of $1.2M from AEP relating to his employment in order to plead guilty to his offense conduct and conclude this matter, he never agreed that (i) this figure represents the net amount he ultimately received from AEP, and more important, (ii) that it has any nexus or connection in any way to any amounts he received or derived as a direct result of the criminality he has admitted he participated in. Stated differently, while the Defendant did understand that this figure would then be mechanically applied for use in determining an adjusted offense level and resulting suggested sentencing range, the Defendant objected and never agreed to that casual connection as being the sole determinator of the severity of the sentence that could be imposed against him. Rather, the Defendant believed that the Court would readily recognize the arbitrary nature of this figure and approach under these particular facts and would apply a downward departure adjustment under Section 5K2.0 within the guidelines structure (if it determines that this type of guideline application is even appropriate in this case) or appropriately factor it in as one of the factors under Section 3553 in application of the sentencing objectives to the unique facts of this case.

1.    **Quantifying a Loss to the Public Directly related to the Defendant's False Reporting Practice.**

It would be extremely difficult, and likely quite costly, to attempt to quantify a loss to the public in this case as it directly relates to the false reporting practices of Defendant Foley and his

co-conspirators relating to their AEP Gulf Desk operations. Frankly, it would be very difficult to discern with any certainty if the totality of this particular false reporting had any impact at all on any reported price indices. These false trades were reported to Platts who used them in formulating indices reported in their publications, *Inside FERC's Gas Market Report* and *Gas Daily*, both of which report prices in the natural gas marketplace. To provide the Court with some background on these reports and publications, attached hereto as Exhibit B is a copy of a 2004 Declaration by Larry Foster, then editorial director for Platts' Power publications. This affidavit was submitted in response to a subpoena for records and documents issued by Defendant Foley in his civil case against AEP in the District Court for the Southern District of Ohio.

As explained in the affidavit, *Inside FERC* ("IFERC") primarily covers natural gas in the monthly markets and *Gas Daily* publishes price indices for the separate daily natural gas market. Affidavit, par. 4. As explained, in a typical month, Platts considers thousands of transactions for its indices and a price range and an index price assessment are reported for nearly 70 pricing points. As explained in the Affidavit, in addition to attempting to analyze the extensive trading transactions reported to it, the Platts reporters used their judgment and experience and follow-up on abnormal pricing to try to determine and report the pricing indexes. This is explained as follows:

> "6.     Once the data has been collected, Platts reporters and editors used their experience, judgment, and analytical tools to identify and question outline data, and in some cases follow-up with telephone calls to their sources to seek confirmation or explanation of the data in question. Reported prices that deviate significantly from others reported for that location and time period may be excluded from the indices unless Platts' editors, exercising their professional judgment, are able to obtain cooperating information. The resulting price indices are determined through a combination of statistical calculations and editors' knowledge of deal-making for the pricing point and time period reported. The indices are not the simple product of a mathematical algorithm, but involve

journalistic judgment at every step, from which data points to collect and accept, how the indices should be adjusted based on editor's knowledge of overall market activity."  Affidavit, para. 6.

The Affidavit goes on to outline that all of the reporting is done on a voluntary and confidential basis.  Furthermore, Mr. Foster stated that summary tabulations of the total volume used in each of the indices did not exist for the 1998 through 2002 time period and would require a substantial amount of time and effort to assemble that type of data.  Affidavit, para. 9.  Thus, in addition to its gathering, formulation, and analysis of very substantial trading data from a substantial number of traders who report on a voluntary versus mandatory basis with little uniformity in the manner of reporting, the reporters ultimately used their own judgment and analysis in determining what data made sense and what did not, and what should be used and what should not.  Thus, with the reporting system that was in place at the time, that was strictly voluntary and followed no structured policies that were in place by AEP, its competitors, or Platts regarding how these trades should be reported, and the interjection of the reporters own judgment and analysis of what made sense, there exists almost no ability to track with any precision whether any of the false data provided by AEP ever had any affect at all on any price indices at any time.

Additionally, in an attempt to provide the court with some additional background information on natural gas price indices existing at that time, the price reporting procedures, and the potential for Mr. Foley's false reporting practices to have any impact whatsoever on the price indices, appended hereto as Exhibit C is a report from a recognized expert in the energy area who opined on the economic role of natural gas price indices and the impact on these price indices as a result of Mr. Foley's and AEP's false reporting practices.  This particular report was specifically obtained for use in the CFTC's case against Mr. Foley, Case No. 2:05-CV-849, in

the District Court for the Southern District of Ohio. This report is a report dated July 31, 2006 by Mr. Foley's expert, Mr. Stephen Kelly. As Mr. Kelly points out in the Executive Summary page on page 2, "the purpose of the report is to investigate the reporting of natural gas trade data used in the development and publishing of natural gas price indices during Mr. Foley's period of employment with American Electric Power ("AEP") (September 1998 to October 2002) and to provide my expert opinions regarding Mr. Foley's price reporting practices as alleged by the U.S. Commodities Future Trading Commission ("CFTC")."

In the report, the expert points out that there does not exist a single market for natural gas, but an array of interrelated market prices for delivery of gas at various locations over a variety of time horizons. Mr. Kelly concluded that the practice of reporting and gathering these indices was very difficult and confusing from both sides. There were no standard reporting requirements by Platts and there were no direction to Mr. Foley on this type of reporting from AEP. Mr. Kelly concludes that the sample size used by IFERC and the corresponding data handling of outlier data in conjunction with the high level of market activity and price transparency in the Gulf Coast region make it highly unlikely for Mr. Foley's price reporting actions to have had a material impact on IFERC's Gulf Coast indices. Kelly Report, pg. 16. Furthermore, he points out that since Mr. Foley correctly reported his trades within AEP for accounting purposes, the submission of price information to IFERC had no relevance on which trades were used to calculate AEP's profitability.

As the Court will see from a review of the report, the expert cannot say with any certainty that the actual false reporting that Mr. Foley and AEP engaged in resulted in any definite harm or market loss, or benefit to AEP. Rather, this is highly speculative.

## V.    APPLICATION OF SECTION 3553 FACTORS TO THE DEFENDANT.

A.     *__The history and characteristics of the Defendant.__*

With the exception of the instant offense conduct, Mr. Foley has never had any involvement with the criminal justice system and has lived a law abiding and exemplary life. Mr. Foley is 44 years old. Mr. Foley has always excelled academically. He received his undergraduate Bachelor of Arts degree from John Carroll University and a Master's degree in International Management from Thunderbird Scholl of Global Management. He speaks fluent French and is very conversant in Spanish. Mr. Foley has been married to wife Sophia for 14 years and they have two children, Patrick, age 11, and Eric, age 9.

In a letter to the Court from Sophia, appended hereto as Exhibit D, she expresses that Mr. Foley is a devoted husband and loving father to his boys and an exemplary son to his mother. Sophia describes that she was recently diagnosed with a 6 centimeter, Stage IIB tumor in her cervix which was exacerbated by stress and a weakened immune system. In March of 2007, she completed chemotherapy and both internal and external radiation and has been unable to help out around the house due to low stamina. As a result of this extremely aggressive oncology treatment, she explains that she is fatigued throughout the day and awaits further prognosis. She outlines Mr. Foley's involvement with the upbringing of their children and she also comments about the extreme hardships they have endured since Mr. Foley's termination from AEP in 2003 and Mr. Foley's fortitude in trying to work through all of this.. She further comments on the financial and emotional toll all of this has had on their family. The Foleys currently rent a residence. This is their second rental in a three year period. Because of job losses and moving and job instability, they have not been able to purchase a home.

From all accounts, Mr. Foley has been an excellent husband and father and is very involved in the raising of his two children and provides substantial assistance to his elderly

mother. *See*, letters to the court from Mr. Foley's wife, Sophia Foley, and from his mother, Sandra Foley, appended hereto as Exhibits D and E. There are additional letters of support and observations regarding Mr. Foley's character from Sarah Shepherd (Exhibit F), a close friend of the Foleys, from Mickey Sullivan (Exhibit G), a long term friend of Mr. Foley's parents and the Foley family, Russ Day (Exhibit H), a long term friend and co-worker, Richard Blaylock (Exhibit I), a former co-worker and friend, and Thomas Manchester (Exhibit J), a long term friend. In addition to these individuals expressing their concern and support of Mr. Foley, these are testimonials outlining the solid attributes and characteristics of Mr. Foley displayed to each of them over a long period of time.

Mr. Foley did not set out to violate the law. He got caught up in what was already an industry wide practice regarding this false reporting. Nevertheless, he admits his wrongdoing and criminality. He recognizes that as head of the trading desk, he was in a unique position to bring light to this and stop this practice but he failed to do so. This was very, very poor judgment for which he has and will pay dearly. Many, many individuals engaged in this industry practice. Many have been prosecuted and many have not. Most have not been sued by the CFTC or paid substantial fines. Mr. Foley requests the Court consider all of these other cases and sentence Mr. Foley in a consistent fashion.

      1.    <u>Employment History</u>.

Mr. Foley is currently employed as a Commodity Trading Manager with Chicago & Illinois River Marketing, LLC. This is a wholly-owned subsidiary of Nidera, Inc. Nidera, Inc. is a closely held company with its headquarters in Rotterdam. His employer is behind him 1000% and it is critically important that Mr. Foley be able to maintain his current job. Mr. Foley is well suited for his current job and he also draws upon his ability to converse in several languages. He

is very fortunate to have located this job and it would be extraordinarily difficult for him to obtain similar employment in this type of field in the future.  His employer is committed to him and holds him in high regard.  *See*, letter to the court from Thomas Coyle, Vice President and General Manager of Chicago & Illinois River Marketing, LLC, appended hereto as Exhibit K.

After Mr. Foley's termination from AEP in October 2002, he moved back to Chicago to attempt to obtain employment.  He obtained employment but the employment was derailed as a result of the CFTC lawsuit.  As a result of this, Mr. Foley has moved from several jobs and he has had to relocate.  He has been with his current employer since October 2006.  Again, he is well suited for this employment and he can maintain this employment unless he is incarcerated. In summary, his employer is very satisfied with Mr. Foley's performance. It has provided substantial encouragement and support to him in light of this issue and sees a potential very bright future with it and is anxious for him to get this matter behind him.

**B.**      ***The nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.***

Mr. Foley acknowledges that this is a serious offense.  To be clear about this however, Mr. Foley did not start, implement, or devise any of the misreporting type practices.  Rather, this misreporting practice was a wide spread industry practice well established prior to Mr. Foley's orientation into energy trading at AEP.  Nevertheless, he acknowledges that he engaged in it and continued it instead of recognizing it for what it was and stopping it or reporting this practice further up the line to authorities at AEP.

As previously stated, this offense conduct has had severe consequences on Mr. Foley. First, this has very much tainted his reputation in the trading arena and he cannot be a commodities futures advisor.  However, he does have the ability to trade in the grain industry

and that is where he started and that is where he is currently employed. Second, this offense conduct and its consequences have been extraordinarily expensive for Mr. Foley. He has paid a $350,000 fine to the CFTC. This has depleted his savings and depleted his children's educational accounts. In addition to that, he had to sue AEP to obtain a portion of his profit sharing account to which he was otherwise entitled. He has paid very significant and substantial legal fees defending against the CFTC action, and his lawsuit against AEP, and in this case. Mr. Foley's reputation has been forever tarnished by these actions and this investigation.

### C. *The need for the sentence to protect the public from further crimes of the defendant and the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

There appears to be no chance of Mr. Foley harming the public any further or committing any further crimes. Mr. Foley would not benefit from any programs or training offered by correctional facilities. Mr. Foley has been a law abiding citizen up to this time. He has no prior criminal record. The Defendant has learned his lesson. Actual facility incarceration will not further reinforce that in any. Rather, actual facility incarceration will leave his wife without a husband and his children without a father all precisely at a time when they need them the most. It will also cost Mr. Foley his employment and likely any opportunity for future employment in this field.

Although the Defendant submits that the provisions set forth in U.S.S.G. Section 5C1.1 that govern the types of sentences that should be imposed related to falling into the various zones on the sentencing table are now equally advisory rather than mandatory on the Court, the Defendant recognizes that this section still serves as a guide for the Court in fashioning how a particular sentence should be served. Under the advisory guidelines, the Court is no longer required to mandate that a sentence it ultimately determines is appropriate be served in strict

conformity with the proscriptions of U.S.S.G. Section 5C1.1. *See*, United States v. Rowan, 2007 U.S. Dist. LEXIS 2126, (E.D. Penn. 2007) (sentence of 5 years probation including 18 months of home detention whereas advisory guideline offense level was 15 and Zone D dictating a sentence of 18-24 months imprisonment); United States v. Repp, 466 F. Supp. 2d 788 (E.D. Wisconsin 2006)(sentence of three years probation with a condition of 6 months home detention whereas advisory guideline resulted in an offense level of 12 and Zone C [10 – 16 months] dictating a sentence of actual incarceration of at least five months); United States v. Cull, 446 F. Supp. 2d 961 (E.D. Wisconsin 2006)(sentence of 3 years supervised release and two months incarceration and 4 months home detention whereas advisory guidelines dictated a incarceration sentence of five months).

A sentence imposing incarceration served as home detention or community confinement and a term of supervised release will be sufficient but not more than necessary under these circumstances to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense.  First, home detention or community confinement constitutes punishment as it severely limits a person's liberty and requires great vigilance and responsibility to strictly adhere to its requirements.  Second, Mr. Foley will be forever branded as a federal felon.  Third, Mr. Foley will be placed on supervised release for a period of time after serving any incarceration and that will effectively monitor his actions and correctional obligations over that additional time.  Incarceration in a correctional facility, when alternatives are available that impose the same punishment, will have no beneficial effect on Mr. Foley whatsoever and would serve no societal function or goals of sentencing.  A sentence of incarceration by home electronic monitoring will also enable Mr. Foley to continue with his

employment and to stay with his wife and two young boys and to assist in their upbringing and to attempt to bring some stabilization to their finances.

      **D.**    ***The need to avoid unwarranted sentencing disparities.***

Since Mr. Foley functioned in a supervisory capacity during his employment at American Electric Power ("AEP") to his co-defendants, Baggett and Hoover, Mr. Foley acknowledges that he was in a position to stop this activity and he should have stopped it. He should not have merely accepted it as standard industry practice and continue to engage in this practice without thoroughly questioning its legality. He paid a substantial $350,000 to the CFTC as a result of his conduct. His punishment for this offense should make sense and not simply based upon some arbitrary figure used to gauge "loss" relating to the niceties of trying to fit this somewhere into the mechanical advisory sentencing guidelines. Rather, his sentence should be commensurate to his criminality which should have some bearing to the actual loss or benefit to Mr. Foley. He has suffered to date for this conduct.

      **E.**    ***The need to order restitution.***

Restitution is not appropriate in this case as there are no identifiable victims.

## VI.   SENTENCING ALTERNATIVES.

If the Court recognizes and agrees that arbitrarily using this loss/gain figure of $1.2M simply to reach a quantifiable analysis to fit into the guideline structure is not appropriate or reasonable and certainly should not dictate the severity of the sentence imposed in this particular case, the defendant suggests several other possible approaches. These approaches are either, (1) that the Court appropriately discount the application of the fraud loss computation in this case and determine an appropriate sentence for Defendant Foley in line with the §3553 purposes and

in relation to the sentences imposed on his co-conspirators; (2) the Court utilize the Guidelines structure and the loss in excess of $1M figure for determination of the U.S.S.G. Section 2B1.1 computation but then apply U.S.S.G. Section 5K2.0(a)(2) to substantially depart downward from that offense level on the basis that this computation requires mitigating circumstances; (3) the Court use the net amount that Mr. Foley ultimately received, which amount is less than $120,000, for computation of an appropriate sentence; or (4) any combination of the above.  If the Court decides to utilize any of these options, Defendant Foley further requests that the Court then factor in the additional §3553 factors in arriving at an ultimate sentence.  These alternative proposed approaches are further explained below.

### A.    <u>Appropriately Discount the Fraud Loss Number</u>.

The use of the greater than $1M number as the fraud loss for purposes of U.S.S.G. Section 2B1.1(b) has no logical or rational connection to either the loss incurred in this case or the benefit or gain received my Defendant Foley as a result of his criminality.  It is simply arbitrary.  As such, this approach should be appropriately discounted and abandoned in this case. Alternatively, the Court should make its sentencing determination utilizing the rest of the Section 3553 factors.

### B.    <u>Application of U.S.S.G. Section 5K2.0 to Depart Downward</u>.

Defendant Foley contends that because the fraud loss computation is so strained, arbitrary, and illogical in this case that, if applied, it warrants an adjustment to the adjusted offense level computation under U.S.S.G. Section 5K2.0 on the basis that the nature of this computation alone presents an exceptional circumstance not contemplated by the Guidelines requiring application of mitigating circumstances.  Although many courts have questioned the relevance of a Guidelines departure regime in the post Booker era, many courts continue to

consider departures under the Guideline regime as relevant to the determination of the appropriate sentence. *See, e.g.* <u>United States v. McBride</u>, 434 F.3d 470, 477 (6th Cir. 2006)("Because Guideline departures are a part of the appropriate Guideline range calculation, we believe that Guideline departures are still a relevant consideration for determining the appropriate Guidelines sentence.").

  **C.**  <u>**Utilizing Net Loss Received of Less Than $120,000**</u>.

  Another approach to utilize in determining a loss computation is to use the net amount that Mr. Foley ultimately received versus the gross amount. Pursuant to the chart on page _____, after deduction for fees to defend this action and/or taxes, the amount remaining is less than $120,000. If that figure is used, pursuant to §2B1.1, that results in a base level of 6, plus 8 levels (more than $70,000 but less than $120,000), for an adjusted offense level of 14. After reduction for acceptance of responsibility credit of 2 levels, that results in an adjusted offense level of 12.

  **D.**  <u>**Applying all of the Section 3553 factors toward determining a equitable sentence**</u>.

  Pursuant to 18 Section 3553, the Guideline's computation and sentencing recommendation is just one of the factors that the Court should take into consideration in sentencing the defendant. That recommendation should not be afforded any more or different weight than any of the other Section 3553 factors. In applying all of these factors, the Defendant respectfully requests that the Court consider imposing a sentence that is fair and equitable and if incarceration is a component thereof, that the Court consider and impose that this incarceration can be served via electronic monitoring at home confinement.

**VII.**  <u>**CONCLUSION**</u>.

Mr. Foley requests that should this court impose a term of incarceration, that it consider the issues relating to the loss computation and the §3553 sentencing purposes and factors and the particular characteristics of Defendant Foley and the facts of this case, that any incarceration be served by home electronic monitoring. In this fashion, although this certainly constitutes punishment, Mr. Foley will have the opportunity to continue his employment and to provide for his family and to assist his wife in the raising of their two children.

Respectfully submitted,

s/ Terrence A. Grady
Terrence A. Grady (0020845)
Terrence A. Grady and Associates Co., L.P.A.
100 East Broad Street, Suite 2310
Columbus, Ohio  43215
Phone:  (614) 849-0378
Facsimile:  (614) 849-0379
Email:  tgrady@tgradylaw.com
Attorney for Defendant Joseph Foley

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant Foley's Sentencing Memorandum in Aid of Sentencing has been served upon, Robertson T. Park, Esq., Senior Litigation Counsel, and Amanda Riedel, Esq., Fraud Section, Criminal Division, United States Department of Justice, 1400 New York Ave. NW, Washington, D.C.  20005, electronically, and to Monica Johnson, U.S. Probation Office, 333 Constitution Avenue N.W., Washington D.C. 20001, via ordinary mail this 28th day of June, 2007.


s/ Terrence A. Grady
Terrence A. Grady  (0020845)
Attorneys for Defendant Joseph Foley

**EXHIBIT LISTING**

| Exhibit No. | Item |
| --- | --- |
| A | Defendant's June 6, 2007 letter to Probation Officer of initial comments and objections to preliminary PSR. |
| B | 2004 Declaration by Larry Foster |
| C | Mr. Stephen Kelly Expert Report dated July 31, 2006 |
| D | Sophia Foley letter |
| E | Sandra Foley letter |
| F | Sarah Shepherd letter |
| G | Mickey Sullivan letter |
| H | Russ Day letter |
| I | Richard Blaylock letter |
| J | Thomas Manchester letter |
| K | Thomas Coyle, VP and General Manager of Chicago * Illinois River Marketing, LLC letter |

# TERRENCE A. GRADY & ASSOCIATES CO., L.P.A.

*a legal professional association*

Telephone: 614/849.0378
Facsimile: 614/849.0379
Email: tgrady@tgradylaw.com

June 6, 2007

*VIA FACSIMILE 202/273-0242*

Ms. Monica Johnson
United States Probation Officer
U.S. Probation Office
United States District Court
for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

RE:    United States v. Joseph Foley
       Case No. CR-07-062-01

       Preliminary Comments to May 23, 2007 Presentence Investigation Report ("PSR")

Dear Ms. Johnson:

I write to provide you with our preliminary comments to the Presentence Investigation Report ("PSR") that you prepared and issued on May 23, 2007.[1] In most respects, we believe that the PSR accurately sets forth the nature of the offense conduct, terms of the Plea Agreement, personal history, and application of the advisory federal sentencing guidelines. In paragraph 82 of your report, you indicated you have not identified nor received any information that would suggest that a departure from the proscribed advisory sentencing guidelines pursuant to the sentencing factors and objectives set forth in 18 U.S.C. §3553(a). In this regard, I want to confirm that the practice in your district is like that in other districts in that these factors are presented to the Court by defense counsel via a sentencing memorandum rather than being included in the PSR. If that is not the case, please let me know.

There are a few items in the report that we wish you will consider expanding upon or clarifying or that we believe are factually inaccurate. These are set forth as follows:

1.    In paragraph 16 of your report, you identify that Mr. Foley considered himself a "junior" with knowledge compared to his co-defendants. While that is also an accurate description, a more accurate description would be to describe him as a "novice" compared to the experience of his co-defendants.

2.    In paragraph 21, you set forth the amount of the loss for application of the sentencing guidelines as more than $1M but less than $2.5M. You indicate that this loss amount was derived from the amount of money the defendant received from the employer as a bonus

---

[1] You faxed me a copy of this on Wednesday, May 30, 2007.

100 E. Broad Street, Suite 2310, Columbus, Ohio 43215                    www.t...

**EXHIBIT**

A

Ms. Monica Johnson
June 6, 2007
Page 2

as a result of his criminal actions in the instant offense. While Mr. Foley agreed to use this figure for the loss computation, characterizing that Mr. Foley received over $1M from his employer *as a result of his criminal actions in the instant offense* is a gross misrepresentation. Mr. Foley was entitled to receive this amount, and even more, as a participant in the company's phantom profit sharing plan that it had established. This plan was designed by AEP to be a long term incentive plan out of a cumulative pool of a portion of the company's earnings generated from a wide variety of energy trading such as electricity trading, gas trading, coal trading, and structured long term marketing deals (mostly electricity). While Mr. Foley does not have a precise breakdown of the origin of the revenue contributions to this plan, he estimates that less than twenty five (25%) of the total contributions to this plan came from the entire gas group. Moreover, his desk's contribution of that percentage was fractional and maybe five to ten percent of that from his gulf coast desk. His participation in this plan covered an approximate five year period, beginning in 1999 (but covering him basically from his start date in 1998) through July 2002. Mr. Foley was entitled to just a fraction of one percent (.0015) share of the total amount in the plan.

Mr. Foley was entitled to his total share being paid to him in July 2002. However, instead of taking this cash at that time, he elected to defer the payout to him (and taxation) of the maximum amount of 90% of his share. As a result, only $200,000 of his total share of $2.2M was distributed to him. When Mr. Foley's employment was terminated, AEP refused to pay over and distribute these funds to him. Mr. Foley ultimately had to sue AEP to recover these funds. AEP countersued him. In the middle of the trial, Mr. Foley agreed to a settlement of $925,000. Of this amount, his attorney was entitled to a 25% contingency fee, plus expenses, netting Mr. Foley $685,000.

It is this $925,000 amount, plus the $200,000 amount that was previously distributed to him, that comprises the in excess of $1M used for the loss computation. As set forth on page 2 of the January 30, 2007 Plea Agreement, the parties agreed that the loss in this case could not be reasonably determined. The fact of the matter is that there is no evidence that this false reporting had any affect at all on AEP's earnings or profitability, or that it had any impact on the market price of gas. While the government represented that it could and would have proven some impact on the price of natural gas and an actual loss, this would have been extraordinarily difficult and likely very expensive. As a result, the parties agreed that the court shall use the gain that resulted from the offense as an alternative measure of loss. In this regard, the parties ultimately agreed that the government could prove that the gain to the defendant was approximately $1.2M. This $1.2M is in fact the gross gain to Mr. Foley from this plan.

This alternative computation was for the application of the sentencing guidelines only. It is simply an arbitrary figure in that Mr. Foley (i) did not receive this amount and, more

Ms. Monica Johnson
June 6, 2007
Page 3

importantly, (ii) it has no nexus or connection in any way to any amounts he received or derived as a direct result of the criminality he has admitted he participated in. Regardless of the documented fact that Mr. Foley actually received far less than this amount, the government was not willing to negotiate from this figure. Rather, the government just took the bonuses paid to Baggett and Hoover and the amount distributed to Mr. Foley from the profit sharing plan and used these numbers to determine the potential incarceration exposure of each of these three co-defendants. We need to be very clear that these figures do not represent the "gain" to Mr. Foley as a result of his criminal conduct. To be very clear, this profit sharing amount does not provide any rationale connection to Mr. Foley's criminality or the benefit he derived from engaging in the conduct he did.

This is also very important given the gross disparity between Mr. Foley's exposure by applying the advisory sentencing guidelines as a result of using this figure versus the exposure and actual sentences of his co-defendants, Baggett and Hoover. Because neither Baggett nor Hoover were participants in the profit sharing plan, the government simply used their annual bonuses as the loss computations. These amounts were such that they placed them in the 12-13 adjusted offense level. As a result, Baggett and Hoover both received probationary sentences.

Although admittedly, Mr. Foley was in a supervisory capacity with respect to Mssrs. Baggett and Hoover, Baggett and Hoover were active, integral, and engaged co-conspirators doing exactly what Mr. Foley was doing to carry out this false reporting practice. Hoover was an experienced cash trader whom I understand was engaged in this false reporting in prior positions before he got to AEP. He was intimately involved in the AEP false reporting. Mr. Foley gave Hoover prices and Hoover inserted the volumes related to monthly reporting to IFERC. Although it appears as though Baggett might not have had the trading backgrounds of Hoover and Mr. Foley, he was again very intimately and actively involved in the reporting of the gas dailys on a day to day basis as he was the person who prepared and transmitted the false information. Given Baggett and Hoover's intimate and active involvement in carrying out the conspiracy, it is disturbing that their sentences (applying the advisory guidelines) can place them in such different positions. Clearly, this was not a case whereby their role in this and the entire loss (however computed) was not foreseeable to each of them. ***Thus, if the loss computation was readily quantifiable and applied, how would either Baggett or Hoover, with their respective degrees of almost daily and active participation in carrying out this practice, obtain far more lenient sentences per application of the guidelines?***

Finally, there is much reference to the fact that this was Mr. Foley's practice as though he engineered this plan? This again is not the case. This practice of falsely reporting trades to IFERC and Gas Daily was rampant in the industry. Some thirty companies were fined

Ms. Monica Johnson
June 6, 2007
Page 4

and numerous individuals were sued civilly by CFTC and criminally by DOJ or both. This practice begun long before Mr. Foley joined AEP and it was in practice when he got there. Three of his subordinates actually participated in this particular activity at other companies prior to coming to AEP. Mr. Hoover, John Hymel, and John Harris all informed Mr. Foley of their engaging in this practice with their previous employers and how it was common industry practice. While Mr. Foley the supervisor should have more closely scrutinized the situation and stopped this practice, this practice was not designed by him as it has been portrayed by Hoover and Baggett in their respective Sentencing Memorandums.

Furthermore, although Mr. Foley was certainly entitled to these funds, he had to sue his employer, AEP, to receive these funds. As a result of his legal expenses related to that, his legal fees related to defending the CFTC action, and his CFTC fine, the net amount that Mr. Foley ultimately received from the AEP plan was substantially diminished. His actual and documented expenses related to this entire matter to date relating to his attempt to obtain his phantom equity plan share are set forth as follows:

| Amount | Item |
| --- | --- |
| **$885,000** | AEP litigation net settlement of $685,000, plus $200,000 previously distributed from plan. This is based upon a gross settlement of $1,125,000 comprised of $200,000 distributed from the plan to Mr. Foley and $925,000 from this lawsuit settlement. |
| [$350,000] | CFTC fine paid |
| [$232,000] | Legal fees paid to Schottenstein, Zox & Dunn related to AEP case representation |
| [$100,000] | Legal fees paid to Schottenstein, Zox & Dunn for CFTC representation |
| [$ 13,000] | Straus & Boies legal fees |
| [$ 30,000] | Legal fees Boies, Schiller & Flexner |
| [$  1,000] | Legal fees Larson & Nierling |
| [$ 17,000] | Expert witness fees paid through Schottenstein, Zox & Dunn |
| [$ 14,481] | IRA penalty for early withdrawal to pay CFTC fine |
|  |  |
| **$757,481** | **Total expenses** |
| **$127,519** | **Balance remaining** |

Importantly, the net figure above does not even factor in the federal and state tax liabilities that were paid on the $665,000 settlement amount. Therefore, after paying several hundred thousand dollars of taxes related to this settlement, he will have a substantial loss related to this matter.

Ms. Monica Johnson
June 6, 2007
Page 5

3.    For clarification purposes, in paragraph 34, although Mrs. Foley apparently complained
to you that she feared she may have throat cancer, she has since been diagnosed by her
doctor and it was determined that she does not have throat cancer. Nevertheless, when
she was talking to you as a result of her other treatment, she had a severe throat irritation.
Obviously, as a result of her medical conditions, she was concerned about that.

4.    In paragraph 38 of the report, just to be very clear, Mr. Foley also suffers from psoriasis
and he applies a topical ointment that he takes as needed called Psorcon. Also, he takes a
hair growth supplement called Finasteride.

5.    In paragraph 40, in addition to Mr. Foley paying a fine of $350,000 to the CFTC, Mr.
Foley incurred legal fees in connection with defending an action in the amount of
$100,000.

6.    Although paragraph 43 is accurate regarding Mr. Foley's drinking habits, he did note that
as a result of all of these actions against him, that when he does drink, he tends to drink in
excess at this point.

7.    In paragraph 49, Mr. Foley advises that while he speaks fluent French and also speaks
Spanish, he indicated that he does not speak fluent Spanish.

8.    In paragraph 51, Mr. Foley has made his employer aware of the pending charges and
related potential consequences. His employer is 1000% behind him at the present time
and is hopeful that his sentence is such that he can maintain his employment.

9.    <u>Financial Condition Set Forth on Pages 10-11</u>.

Under the "Cash" section, you reference that Mr. Foley has $317,897 in his LaSalle
Bank/checking account. Mr. Foley only had that amount at the time he met with you
because he had transferred that amount to that account to pay his 2006 federal and state
taxes in the amounts of $286,756 and $21,254, respectively (you note this in paragraph
27 of your report). Therefore, his current balance in his checking account is less than
$10,000. Further, under the "Cash" section, you list Mr. Foley as having $685,942 of
cash from the AEP retirement account. Mr. Foley does not have that balance. Rather,
that balance is included in the other cash balances that you have identified.

Under "Equity and Other Assets" section, you identified a profit from Mr. Foley's sale of
his house in Bexley, Ohio at $140,000 as if this is currently an asset. For your
information, Mr. Foley sold the house for $600,000 and he purchased the house for
$575,000. After paying commissions and paying for mold eradication, Mr. Foley
essentially sold the house at a loss (you also need to correct these figures in paragraph 63

Ms. Monica Johnson
June 6, 2007
Page 6

of the report). This $140,000 needs to be eliminated from the balance sheet as this asset has been sold and there were no proceeds from the sale. You apparently used the amount of his mortgage of $460,000 as his purchase price.

Accordingly, Mr. Foley has total assets of approximately $611,576 instead of $1,750,917 as set forth in your report.

10.    Under the "Monthly Cash Flow" section, you indicate that Mr. Foley has an interest from IRA's of $1,567. While this is interest that accumulates on a monthly basis, this is not from the IRA accounts.

11.    In paragraph 56 of the report, you have a sentence that reads "Additionally, he advised he pays an additional $3,786 for legal fees and his wife's medical expenses." That statement should be deleted.

12.    In paragraph 60, you accurately set forth that Mr. Foley depleted his kid's college savings accounts. This money was depleted not to pay the legal fees, but it was depleted to pay the CFTC fine.

Thank you for your consideration of our initial comments to your report. Please contact me if you wish to discuss any of these comments and suggested changes in more detail or if you need any additional documentation or information concerning this. Thank you very much for your prompt attention to and cooperation in this matter. I look forward to talking with you.

Very truly yours,

Terrence A. Grady

TAG:cls

Enclosure
cc:    Joseph Foley
        Robertson Park, Esq., attorney for the government (via facsimile 202/514-0152)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                     :

JOSEPH P. FOLEY                     :     **DECLARATION OF**
                                     :     **LARRY FOSTER**
                Plaintiff,      :
                                       :

          v.                        :     Misc.
                                       :     Southern District of Ohio
                                     :     2:03-CV-00328
                                     :

AMERICAN ELECTRIC POWER      :
COMPANIES, INC., et al.         :
                Defendants.    :
                                     :
-------------------------------------------------------x

LARRY FOSTER, being duly sworn, deposes and says:

1.    I am the Global Editorial Director for Platts' Power publications, a position I have held since November 2003. Prior to that date, I was Editorial Director for Platts' U.S. Natural Gas publications, a positioned I assumed in 1995. The Power Group includes publications covering U.S. natural gas, U.S. electricity, European gas and electricity, global coal, global nuclear, and energy policy. I have worked for McGraw-Hill in various capacities (including working as a reporter) since 1980, always for publications covering the natural gas and electricity markets. I received my B.A. in journalism from the University of Rhode Island in 1974, after which I worked as a reporter and editor for various publications before obtaining an M.A. in journalism from the University of Wisconsin in 1980.

2.    McGraw-Hill is a leading educational and business publisher whose operations include magazines like *BusinessWeek* and business information services like Standard & Poor's, a leading provider of financial ratings and analysis. Platts is a division of The McGraw-Hill

Companies, Inc. and is the world's largest and most reliable source of news and information about the energy industry. Beginning with the first publication of *Platts Oilgram* in 1923, Platts has grown to include over 50 newsletters and magazines covering various aspects of the energy industry.

3.    In my capacity as Editorial Director for U.S. Natural Gas until November 2003, I directly oversaw various Platts publications, including *Inside FERC's Gas Market Report* (*"Inside FERC"*) and *Gas Daily*, both of which provide news and analysis of current events, market developments, and prices in the natural gas marketplace. (Examples of both publications are annexed hereto as Exhibits A and B). *Inside FERC* is published biweekly, while *Gas Daily* is (as the name suggests) a daily publication. Each publication is sold via subscription and is available to any member of the public who wishes to purchase it.

4.    As part of their extensive news coverage of the natural gas industry, *Inside FERC* and *Gas Daily* publish price indices covering numerous pricing points across the United States. *Inside FERC* primarily covers natural gas prices in the monthly market, while *Gas Daily* publishes price indices for the separate daily natural gas market. The indices are based on information obtained firsthand by Platts reporters from actual buyers and sellers in the marketplace. Platts' price indices and assessments are based only on original reporting and do not incorporate other publicly available price surveys. Platts gathers information for its indices with the express intent to disseminate it to the public.

5.    Currently, virtually all monthly prices are obtained by *Inside FERC* in electronic form, although prior to July 2003 prices were also obtained *via* phone and fax. In a typical month, Platts considers thousands of transactions for its indices. A price range and an index price assessment are reported for nearly 70 monthly pricing points. Prices for the daily indices

2

published by *Gas Daily* likewise are now obtained electronically, on spreadsheets sent by email. The daily indices currently cover about 85 different pricing points.

6.    Once the data has been collected, Platts reporters and editors use their experience, judgment and analytical tools to identify and question outlying data, and in some cases follow up with telephone calls to their sources to seek confirmation or explanation of the data in question. Reported prices that deviate significantly from others reported for that location and time period may be excluded from the indices unless Platts' editors, exercising their professional judgment, are able to obtain corroborating information. The resulting price indices are determined through a combination of statistical calculations and editors' knowledge of deal-making for the pricing point and time period reported. The indices are not the simple product of a mathematical algorithm, but involve journalistic judgment at every step, from which data points to collect and accept, to how the indices should be adjusted based on editors' knowledge of overall market activity.

7.    Platts' sources provide price information with the express understanding that their identity will not be revealed and that the information they provide will not be attributed to a particular company or trader. Absent that assurance, traders fear that their competitors or counter-parties will know the specific price at which that particular trader bought or sold, giving an unfair advantage in future transactions. Thus, the understanding that particular pricing data will not be attributed to a particular trader or company is crucial -- indeed indispensable -- in order for Platts to obtain a broad range of price and volume information. Without the promise of confidentiality, there is no doubt the sources of information would simply dry up. Indeed, a number of sources have stopped providing pricing information to Platts out of fear that the confidential information provided to Platts will be subject to subpoena by the government or a source's litigation adversary.

3

JPF-00238

8.    The energy industry has for more than 75 years looked to Platts as the most reliable source of industry news and pricing information. In providing reliable price information, Platts plays a vital role in maintaining the transparency of the markets on which it reports, and makes a significant contribution to the effective and efficient operation of these energy markets. Because Platts has no government mandate, no subpoena power, and no way to compel sources to provide accurate and complete information, Platts must rely on its ability to obtain information through journalistic means honed over decades of reporting on its markets. Platts' effectiveness in collecting the breadth and depth of information needed to bring transparency to these markets stems from Platts' reputation for integrity, objectivity and independence and – crucially – from its ability to promise confidentiality to its sources.

9.    On their face, the Subpoenas issued by plaintiff directly compromise this vital interest. For example, the Document Subpoena includes within its sweeping terms "any and all documents *relating to*" the number of transactions and total volume used in each of the eighteen monthly indices – one for each "hub" or point of distribution of natural gas – created by Platts. (Although only a dozen hubs are listed in the Document Subpoena, the list in fact refers to 18 separate hubs.) (*See* the accompanying Affidavit of Victor A. Kovner, attaching the Subpoenas as Exhibit C) (emphasis added). Like the other requests contained in the Subpoena, this request includes no provision to exclude confidential documents and would include, among numerous other categories of documents, any and all correspondence between Platts reporters and confidential sources regarding the monthly indices. Moreover, summary tabulations of the total volume used in each of the indices do not exist for the 1998 through 2002 time period and would require a substantial amount of time and effort to assemble.

10.    These are not the only disturbing effects that flow from the issuance of Subpoenas precisely like these. There are also more intangible -- but no less serious – consequences, such

4

JPF-00239

as the increased incentives placed on Platts to promptly discard potentially valuable unpublished information in order to avoid the crushing burden imposed by having to comply with numerous subpoenas. The credibility of McGraw-Hill as an impartial observer of the commodity markets and its ability to gain access to otherwise unavailable information will be undermined if reporters become routine sources or witnesses for one side or the other in the adversarial process – which is precisely what plaintiff is seeking to do here.

11.     In my view, compliance with the Subpoenas as currently written would add a vast additional burden on our resources and would directly interfere with the newsgathering, reporting, and business functions of *Inside FERC* and *Gas Daily*. For example, the sweeping terms of the Document Subpoena ("any and all documents relating to" eighteen monthly indices over a five-year period) call for thousands, if not tens of thousands of documents. Further, since the information sought includes privileged journalists' communications with potentially confidential sources, and the like, complying with plaintiff's requests would require Platts' journalists to spend literally hundreds of hours combing through document files, email files, phone records, and other files. For all these reasons, I respectfully request that the Court grant McGraw-Hill's motion to quash the Subpoenas.

12.     I declare under penalty of perjury that the foregoing is true and correct.

September 7, 2004
New York, NY

_Larry Foster_

Larry Foster

NYC 149830v1

5

JPF-00240

Investigation on:

Reporting Natural Gas Trade Data for the Development and Publishing of Price Indices

Prepared for:

Schottenstein Zox & Dunn Co., LPA

Pertaining to:

U.S. Commodities Futures Trading Commission v. Joseph P. Foley

Case No. 2:05-CV-849

United States District Court for the Southern District of Ohio, Eastern Division

July 31, 2006

by

Stephen A. Kelly

4027 Byron

Houston, Texas 77005

281.300.6412

skelly1@earthlink.net



## Executive Summary

The purpose of this report is to investigate the reporting of natural gas trade data used in the development and publishing of natural gas price indices during Mr. Foley's period of employment with American Electric Power ("AEP") (September 1998 to October 2002) and to provide my expert opinions regarding Mr. Foley's price reporting practices as alleged by the U.S. Commodities Futures Trading Commission ("CFTC"). Based upon a reasonable degree of energy industry expertise, I have reached the following conclusions and opinions:

1)  The lack of energy industry standards regarding the practice of developing and publishing natural gas price indices contributed to traders reporting information to natural gas index price compilers in a manner alleged by the CFTC. This conclusion is based upon the following:

    a.  Traders were uncertain in terms of what price data was required to be reported to the index price compilers.

    b.  The index price compilers did not employ statistically valid sampling procedures in calculating and publishing the indices and had no formal procedures to verify price information submitted by market participants.

    c.  Most companies in the industry lacked internal processes and controls to insure the integrity of the reported price data.

2)  The lack of best practices and procedures that AEP had in place for its AEP Energy subsidiary contributed to traders reporting information to natural gas index price compilers in a manner alleged by the CFTC. This conclusion is based upon the following:

a. In addition to AEP not having a process in place for gathering and reporting price information prior to Mr. Foley's termination, the company also failed to adhere to best practices by allowing the traders, and not the middle office, to report prices directly to the index price compilers.

b. Mr. Foley received no formal instruction or training in the trading of natural gas even though he lacked any experience in the industry prior to becoming employed with AEP. There was also no explicit mention of the false reporting of price data in AEP's risk policy or ethical documents prior to Mr. Foley's termination.

c. AEP corrected it's failures in a) and b) above, only after Mr. Foley's termination, by implementing a price reporting process consistent with best practices and specifically prohibiting the false reporting of price data in its ethical documents.

3) Mr. Foley's alleged practices of reporting price data to Inside FERC would have had neither a positive or negative impact on AEP's profitability. This conclusion is based upon the following:

a. The number of transactions utilized by Inside FERC in its sample and the recognition and treatment of outlying data make it highly unlikely for a trader to impact the indices.

b. The high level of market activity and price transparency in Mr. Foley's areas of activities, the gulf coast region, make it highly unlikely for a trader to impact the Inside FERC indices.

3

c. The lack by either the Federal Energy Regulatory Commission ("FERC") or AEP to find that the alleged misreporting of price data to Inside FERC had any impact on the indices, both from an industry wide perspective and specific to Mr. Foley's alleged activities.

d. The alleged practice of reporting price information to Inside FERC had no bearing on which trades Mr. Foley reported internally within AEP for accounting purposes.

## Qualifications

My name is Stephen A. Kelly and I am an independent energy consultant. I have held a number of positions over the last 23 years in the areas of energy marketing and trading. My current work focuses on providing consulting services for energy clients in the risk management arena. Much of this work revolves around identifying and measuring risk and improving risk management processes. I also designed and taught a number of energy risk management courses at Rice University to industry participants. Prior to this work, I was a Director of Corporate Risk Management for El Paso Corporation. While at El Paso, I participated in the Committee of Chief Risk Officers (CCRO), a coalition of energy companies that strives to strengthen risk management and disclosure practices in the physical and financial trading of electricity and natural gas. I played a leadership role in developing the Emerging Practices for Assessing Capital Adequacy white paper released by the CCRO on September 17, 2003, a copy of which is contained in Exhibit A. Prior to El Paso, I held a number of senior commercial positions with various companies where I headed up the marketed and trading of physical and financial natural gas. I have a Bachelor of Science from The Pennsylvania State University and a Master of Business Administration from Fairleigh Dickinson University. A completed copy of my curriculum vitae is attached as Exhibit B.

4

**Materials Reviewed**

I based this review and report, in part, on my experience in the fields of energy risk management and the marketing and trading of natural gas. I have also reviewed the following materials provided by your office:

Documents specifically pertaining to Joseph P. Foley v. American Electric Power Co., Inc., et al  Case No. 03-CV-328, United States District Court for the Southern District of Ohio Eastern Division:

1) Complaint dated April 11, 2003

2) Defendants' Answer and Counterclaims of Defendants dated July 16, 2003

3) Plaintiff's First Request for Production of Documents to Defendants dated March 17, 2004

4) Plaintiff's First Set of Interrogatories and Requests for Admission to Defendants dated March 17, 2004

5) Defendants' Responses to Plaintiff's First Report for Production of Documents to Defendants dated June 9, 2004

6) Defendants' Objections and Answers to Plaintiff's First Set of Interrogatories and Answers to Plaintiff's Requests for Admission Directed to Defendants dated June 9, 2004

7) AEP Energy Services, Inc. Phantom Equity Plan effective July 1, 1997

8)   American Electric Power System Incentive Compensation Deferral Plan effective January 1, 2001

9)   First Amendment to American Electric Power System Incentive Compensation Deferral Plan effective January 1, 2001

10)  American Electric Power System Incentive Compensation Deferral Plan – Deferral Election Form for AEP Energy Services, Inc. Phantom Equity Plan dated August 25, 2001

11)  American Electric Power System Incentive Compensation Deferral Plan – Distribution Payment Election dated August 25, 2001

12)  AEP Trading Risk Policy as approved by AEP Risk Executive Committee dated May 14, 2002

13)  Receipt of AEP Trading Risk Policy signed by Joseph P. Foley on July 12, 2002

14)  AEP Press Release dated October 9, 2002 titled "AEP dismisses five for providing inaccurate market data for indexes"

15)  Letter to Mr. Joseph P. Foley from Janet Holliday, Senior Executive Benefits Consultant dated October 9, 2002

16)  AEP Inc. Compensation Deferral Plan Distribution Statement dated October 10, 2002

17)  American Electric Power Notification of Direct Deposit from Joseph P. Foley dated October 18, 2002

18) Revised Letter to Joseph P. Foley from Janet M. Holliday, Senior Executive Benefits Consultant dated October 18, 2002

19) Letter to Joseph P. Foley from Andrew Carlin, Director Compensation and Executive Benefits dated December 6, 2002

20) Letter to ICDP Appeal Committee from Donald W. Nierling, Esq. dated January 2, 2003

21) Minutes from February 28, 2003 American Electric Power System Incentive Compensation Deferral Plan Appeal Committee Meeting

22) Letter to Donald W. Nierling, Esq. from ICDP Appeal Committee dated March 4, 2003

23) Letter from David A. Laing Senior Counsel to Donald Nierling, Esq. dated March 4, 2003

24) Deposition of Joseph P. Foley dated May 13, 2004

25) Declaration of Larry Foster, United States District Court for the Southern District of New York, dated September 7, 2004

26) AEP's Principles of Business Conduct

27) AEP's Principles of Business Conduct – The Power of Integrity

28) AEP System Employee – Power in Our People

29) American Electric Power Risk Management Policy

30) Personnel File of Joseph P. Foley

31) AEP Orientation and Training Documentation for New and Existing Employees

32) "Introduction to FERC Orders 888/889 and the Standards of Conduct" Training Documentation

33) Monthly Cash Trading Reports November 2000 through October 2002

34) Daily Cash Trading Reports November 2000 through October 2002

35) CD containing AEP gulf coast index related transactions completed between November 2000 and October 2002; 358MB – Access database file

36) McGraw Hill Representative Sample of Methodology; MG0001 – MG0011

Documents specifically pertaining to U.S. Commodity Futures Trading Commission v. Joseph P. Foley Case No. 2:05-CV-849, United States District Court for the Southern District of Ohio Eastern Division:

37) Complaint for Injunctive And Other Equitable Relief and Civil Monetary Penalties Under The Commodity Exchange Act filed September 14, 2005

38) Answer Of Defendant Joseph P. Foley to Plaintiff's Complaint

I also reviewed the following additional references:

39) The Committee of Chief Risk Officers, Governance and Controls white paper dated November 19, 2002

40) The Committee of Chief Risk Officers, Best Practices for Energy Price Indices white paper dated February 27, 2003

41) The Final Report on Price Manipulation in Western Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, FERC Docket PA02-2-000, Executive Summary and Chapter III, dated March 2003

42) The Order Directing Submission of Information with Respect to Internal Process for Reporting Trade Data, FERC Docket PA03-1-000, et al, dated April 30, 2003

43) The Report on Natural Gas and Electricity Price Indices, FERC Docket PL03-3-004 and AD03-7-004, prepared by the Staff of the FERC dated May 5, 2004

44) The Submission by AEP of Information with Respect to Internal Processes for Reporting Trading Data, FERC Docket PA03-1-000, prepared by AEP dated June 13, 2003.

45) Platts Methodology and Specifications Guide, North American Natural Gas, latest update: August 2004

## Introduction

Natural gas price indices are used throughout the industry as benchmarks for pricing many different types of natural gas related transactions. Most of these indices are published on a daily and monthly basis at a multitude of locations by natural gas index price compilers that are part of the industry trade press (hereinafter refer to index price compilers as "trade press"). Terms for the delivery of natural gas in the physical marketplace are most commonly negotiated on a daily or monthly basis. The most widely used price indices are Gas Daily (daily) and Inside FERC (monthly), both of

which are Platts publications and part of the McGraw Hill Companies. Platts gathers information from market participants and analyzes this data in order to calculate and publish these indices. In addition to gathering information daily for the daily indices, Platts obtains monthly information from market participants during the last few trading days of each month when transactions are completed for the following month's deliveries. These few days are known as "bid week" in the natural gas industry. Platts monthly price indices are intended to reflect only fixed priced physical transactions that are negotiated during this bid week period. In addition to Platts and other trade press publications, electronic trading platforms capture information and impact the gathering of data for price reporting purposes.

## Industry Standards for Price Reporting

The industry practice of reporting natural gas price data was fundamentally flawed during Mr. Foley's period of employment with AEP. There were serious problems on both ends; traders (also referred to as "market participants") were unsure of the price data to report to the trade press and the trade press had no established methodology to calculate its natural gas price indices. Furthermore, most companies lacked the appropriate reporting conventions and internal controls to ensure the integrity of the reported data while the trade press employed much discretion in regards to what price data was and wasn't included in the development of its indices. The Federal Energy Regulatory Commission ("FERC") has come to similar conclusions as evidenced in the Final Report on Price Manipulation in Western Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, Docket No. PA02-2-000 and attached as Exhibit C. Correspondingly, there was no source of best practices for data submission and index construction in the natural gas industry. The Committee of Chief Risk Officers agreed with this statement and provided a framework for compiling energy price indices, albeit after Mr. Foley's termination, in the Best Practices for Energy Price Indices white paper attached in Exhibit D.

## Market Participants

Since there are relatively few fixed priced physical transactions during bid week, market participants have been skeptical of the ability for these transactions to present an accurate picture of the monthly natural gas trading activity. The FERC Staff came to the same conclusion (Final Report PA02-2-000 at III-31). Compounding this lack of activity was the confusion of what data the trade press, such as Inside FERC, was actually looking for from market participants. Some traders were convinced that Inside FERC was looking for a combination of actual trades and observed trades and were aware that they were getting both types of trades from market participants. Evidence to this is Williams Energy Marketing and Trading Company's response to a FERC Staff request regarding its traders misreporting of price information by stating that this misreporting was explained, in part, by "...the belief that Inside FERC expected Williams to report not only transactions to which Williams was a party, but other transactions occurring during bid week..." (Final Report PA02-2-000 at III-9). Traders at Williams also claim that Inside FERC knew that the reporting of both actual and observed trades was taking place (Final Report PA02-2-000 at III-10). Another trader at Dynegy, Inc. reiterated that both actual and observed trades were reported (Final Report PA02-2-000 at III-6) and he was certain that "Inside FERC knew what they were getting" (Final Report PA02-2-000 at III-6).

Electronic trading platforms also captured trading data. Enron Online ("EOL") was Enron's electronic trading platform where Enron was on one side of every completed transaction. EOL was a significant source of price discovery in the natural gas marketplace. Many market participants represented trades that were observed on this platform as transactions they had made themselves (Final Report PA02-2-000 at III-34); therefore, much of the trade data on EOL was sent over and over to the trade press.

As market participants reported both actual trades and observed trades, fabricated trades were also being reporting. In some instances this was to counteract false reporting by other market participants including the perceived influence by Enron in the marketplace (Final Report PA02-2-000 at III-6). Other times, traders were not trying to affect the

price indices but simply attempting to "fill in the gaps" as there were relatively few fixed price physical deals occurring during bid week. In the <u>Order Directing Submission of Information with Respect to Internal Processes for Reporting Trade Data</u>, PA03-1-000 Brownell, Commissioner, concurring dated April 30, 2003 attached in Exhibit E, Commissioner Brownell of the FERC found this same "gap filling" activity by stating, "It is also clear that for some traders the reporting of data was not necessarily for the purpose of effecting price, but to provide enough data for price formation at a point that lacks sufficient fixed-price physical deals." (<u>Order Directing Submission</u>, PA03-1-000 at Brownell, Commission, concurring). Traders would typically look at predefined relationships between the index points and utilize certain financial market indicators that were taking place during bid week in order to provide the trade press with an accurate assessment of where the monthly market was trading.

### Trade Press

The gathering of monthly trade data by Inside FERC during Mr. Foley's employment with AEP was accomplished through Inside FERC's standardized spreadsheets where market participants provided data on certain types of trades during the bid week period. These spreadsheets were confusing in respect to what data was actually required. For example, a majority of traders did not provide counterparty data while others did provide this information. Additionally, on one part of the spreadsheet market participants were required to specifically exclude certain types of non-fixed priced deals but then were asked to include a range for these same types of deals on another part of the spreadsheet. (Monthly Cash Trading Reports at AEP/Foley 2230). The Inside FERC spreadsheet is attached in Exhibit F. As this spreadsheet format evolved over time the range for the types of transactions narrowed and added to the confusion over the data required to be submitted (<u>Final Report</u> PA02-2-000 at III-9).



There was a lack of statistically valid procedures by the trade press in ultimately calculating and publishing natural gas price indices as well as no formal procedures to verify data (Final Report PA02-2-000 at III-1, 37). For example, the majority of market participants did not provide counterparty data; therefore, there was no way for Platts to validate the data received by the market participants. Without counterparty data from all market participants, there is no assurance that any published index is accurate. With Platts being unable to validate its data and aware that some of this data was redundant and incorrect, Platts had to rely on judgment and subjectivity when calculating and publishing the indices.

## AEP Standards for Price Reporting

AEP was one of several energy trading companies that the FERC investigated for providing false price data to the trade press. For a majority of the companies investigated, including AEP, traders provided data directly to the trade press with little oversight by management. One of the hallmarks for best practices in energy risk management is the theme of an independent middle office function that works separate from the front office, e.g. traders. This independent middle office role is part of an effective risk control infrastructure and reports up to a company's chief risk officer. Key functions for the middle office include validating all front office transactions and analyzing and reporting these transactions to management. The reporting of transactional data to the trade press is a natural extension of these middle office responsibilities. Prior to October 2002, AEP had no process in place for gathering and reporting data to the trade press (Final Report PA02-2-000 at III-9). There was also no explicit mention of the prohibition of false reporting of price data to external parties in AEP's basic company ethical standards documents prior to October 2002. Moreover, although Mr. Foley had no prior experience trading natural gas before he started work with AEP, he did not receive any formal instruction or training in regards to trading natural gas during his employment with AEP (Foley Deposition at 34).

As evidenced by AEP's response to the FERC in the <u>Submission by AEP of Information with Respect to Internal Processes for Reporting Trading Data</u>, Docket No. PA03-1-000 and attached as Exhibit G, the company implemented corrective measures to its procedures for reporting price information to the trade press after Mr. Foley's termination.  These corrections were; to cause all price information to be verified by its chief risk officer before being submitted to the trade press, to require that reports be generated directly from its internal system for recording trades, and to amend the AEP Code of Conduct to specifically address the false reporting of price data (<u>Submission by AEP</u> PA03-1-000 et. al. at 2, 4).

**Price Reporting Practices Impact on AEP Profitability**

Although detailed transactional data on a monthly basis is not available to substantiate the Inside FERC indices, McGraw Hill has provided a sample of the process it uses to determine these indices.  <u>The McGraw Hill Representative Sample of Methodology</u>; MG0001 - MG0011 is contained in Exhibit H.  In addition, Mr. Larry Foster, an editor with Platts, has also commented on this process.  These comments are contained in <u>Declaration of Larry Foster</u>, United States District Court for the Southern District of New York, dated September 7, 2004 and attached as Exhibit I.  Platts considers thousands of transactions in a typical month when determining its Inside FERC monthly price indices (<u>Declaration of Larry Foster</u> at 2) and publishes price information for 70 monthly index points (<u>Declaration of Larry Foster</u> at 2).  By using its significant experience in the marketplace, Platts disseminates these transactions and questions outlying data and may decide to exclude this outlying data when formulating the indices (<u>Declaration of Larry Foster</u> at 2, 3).  Mr. Foster has stated that, "The resulting price indices are determined through a combination of statistical calculations and editors' knowledge of deal-making for the pricing period and time period reported" (<u>Declaration of Larry Foster</u> at 3).  Traders tended to acknowledge Inside FERC's ability to handle outlying data and come up with representative indices; in its response to the FERC Staff request, Williams traders believed that Inside FERC was able to "…ferret out the most egregious reporting and arrive at generally accurate price indices" (<u>Final Report</u> PA02-2-000 at III-10).



Commission Brownell believed that the "...market continued to use the reported prices because they believed the indices generally reflected supply and demand fundamentals." (Order Directing Submission PA03-1-000 at Brownell, Commissioner, concurring). Furthermore, traders tended to understand that if they reported prices too far out of line with real prices, the editors of Inside FERC would not include these in determining the price indices; therefore, traders that were reporting false data kept this data within the range of actual trading (Final Report PA02-2-000 at III-32).

Mr. Foley's has testified that his alleged price reporting activities were limited to providing Inside FERC with monthly price data for the gulf coast region (Foley Deposition at 76, 110). The gulf coast region is the primary region for natural gas supplies in the United States. Corresponding to this supply base is a vast network of pipelines that serve as initial aggregation points for moving natural gas from the gulf coast to the metropolitan markets. The density of the pipeline network in the gulf coast region allows for ample capacity to move natural gas within this region; this plays a key role in making this region the most active area in terms of market participation. This is evidenced further by the fact that the New York Mercantile Exchange's (NYMEX) natural gas futures contract has its delivery point in the gulf coast region at the Henry Hub in Louisiana. It is crucial for futures contracts to have a delivery point that is in an area where there is a high level of market activity and the underlying product is easily delivered on a physical basis. The Henry Hub is recognized as the most actively traded point in the natural gas marketplace with the ability to deliver gas into a majority of the major pipelines in the gulf coast. This level of activity at the Henry Hub migrates back to the other gulf coast locations due, again, to the many transportation options available in moving gas within the gulf coast region. Furthermore, there is a high level of price transparency in the gulf coast region; traders are able to discover the price relatively efficiently, particularly when factoring in the ability to view a NYMEX price during most business hours. The access to supplies and transportation flexibility permits consistent price relationships to develop between gulf coast points, further increasing the transparency of prices within this region.

The sample size used by Inside FERC and the corresponding handling of outlier data in conjunction with the high level of market activity and price transparency in the gulf coast region make it highly unlikely for Mr. Foley's alleged price reporting actions to have had a material impact on Inside FERC's gulf coast indices. There has been no determination that any misreporting of prices within the industry had any affect on the Inside FERC indices (Order Directing Submission PA03-1-000 at Brownell, Commissioner, concurring). Additionally, AEP did not determine specifically if Mr. Foley's alleged price reporting activities had any impact on the Inside FERC indices (AEP Press Release date October 9, 2002).

There is no correlation between Mr. Foley's alleged price reporting practices to Inside FERC and which trades were reported within AEP for accounting purposes. Mr. Foley reported all his trades correctly within AEP; therefore, the submission of price information to Inside FERC had no relevance on which trades were used to calculate AEP's profitability.

**Attachments**

I have attached the Committee of Chief Risk Officers Emerging Practices for Assessing Capital Adequacy white paper released on September 17, 2003 in Exhibit A. Although this white paper was not published under my name, I played a leadership role in developing much of the content. I have no other publications to offer.

My Curriculum Vitae (CV) is attached in Exhibit B.

The Final Report on Price Manipulation in Western Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices, FERC Docket PA02-2-000, Executive Summary and Chapter III, dated March 2003 is attached in Exhibit C.

The Committee of Chief Risk Officers, Best Practices for Energy Price Indices white paper dated February 27, 2003 is attached in Exhibit D.

The Order Directing Submission of Information with Respect to Internal Process for Reporting Trade Data, FERC Docket PA03-1-000, et al, Brownell, Commissioner, concurring dated April 30, 2003 is attached in Exhibit E.

Inside FERC Spreadsheet is attached in Exhibit F.

The Submission by AEP of Information with Respect to Internal Processes for Reporting Trading Data, FERC Docket PA03-1-000, prepared by AEP dated June 13, 2003 is attached in Exhibit G.

McGraw Hill Representative Sample of Methodology; MG0001 – MG0011 is attached in Exhibit H.

Declaration of Larry Foster, United States District Court for the Southern District of New York, dated September 7, 2004 is attached in Exhibit I.

**Compensation and Previous Expert Witness Testimony**

My fee schedule is $200.00 per hour plus expenses. To review all materials to date and prepare this report, I have been compensated approximately $20,000.00. If called to testify, my deposition and testimony rate is also $200 per hour plus expenses.

I have not undertaken any previous expert witness work including any testimony as an expert witness in a trial or deposition.

I have read each statement in the foregoing report and of my own personal knowledge I verify that each statement is true. These opinions are based upon a reasonable degree of energy industry experience.

_____          7-31-2006
Stephen A. Kelly                        Date

18

June 5, 2007

Honorable Judge John D. Bates
United States District Court Judge
United States District Court
District of Columbia, Washington, D.C.

Dear Judge Bates:

My husband, Joe Foley, and I have been happily married for 14 years. We met at the American Graduate School of International Management (Thunderbird) in 1987 and dated for several years. We subsequently married in Chicago on April 24, 1993 and have two beautiful boys, ages 11 and 9. Joe, is the kindest person you could ever meet. Not only is he is an extremely loving father to his boys, Patrick and Eric, but he is my best friend, a devoted husband, and an exemplary son to his mother, a recent widow (his dad died of esophagheal cancer in 2005). Joe is also a hard worker, but despite his long work days, he never forgets to spend time playing baseball with our boys. At night, we always eat dinner together and help our children with homework. Joe is the epitome of normalcy/Americana and his children and I look to him for guidance. The best thing about Joe is that he is devoutly positive and extremely non-judgmental. He always believes in the goodness of people and that is the reason why we have survived this recent nightmare.

We have had extreme hardships since leaving Ohio in 2003. Joe was unemployed three times and on top of that, paid a fine of $350,000. We nearly exhausted our retirement savings and cleaned out our children's educational funds. We had no insurance for awhile and could no longer buy a home (we are currently renting a second time.) My son Patrick had difficulty in school as a result of our frequent moves. To make matters worse, I developed a 6 centimeter, stage 2B tumor in my cervix which was exacerbated by stress and a weakened immune system. In March of this year, I completed chemo and radiation and have been unable to help out due to low stamina. I am fatigued throughout the day and await further prognosis. To sum it up, I really count on my husband to support our children and me.

Your Honor, please recognize that we have paid an enormous price already. We have suffered tremendously as a family both emotionally and financially. So I plead with you… to consider the reality that my physical condition precludes me from working and supporting our two children. As you sentence my husband, please know that our sons Patrick and Eric are in need of their father and are at a critical stage in their lives. Please do not take away what little we have left.

Respectfully,

Sophia Y. Foley

EXHIBIT

D

Honorable Judge John D. Bates
United States District Court Judge
United States District Court
District of Columbia
Washington, D.C

Dear Judge Bates:

This is a very difficult letter for me to write. I am a 72 year old mother pleading for her son's future.

I lost my 27 year old son in 1988—Joe's only sibling. No one can imagine the heartache of losing a child unless they have experienced it. Joe was devastated.

Joe was a bright, loving son, excellent student, athlete and well liked by his peers. My husband and I gave both boys the best educations we could afford. Joe graduated from Walsh Jesuit High School, John Carroll University and the American Graduate School of International Management. He studied at the Sorbonne in Paris as part of his master's program. He is gifted in foreign languages and uses these skills in his current job.

Joe has two sons, ages 11 and 9. He is an assistant coach on both boys' baseball teams and spends hours playing baseball with them at home. He plays an active part in their school activities. Since Sophia, his wife, is so ill, Joe has taken on even more responsibility with the boys.

The past five years have been a nightmare for our family. Joe has been unemployed, fined and lost most of his savings to lawyers. I had a stroke, my husband of 46 years died of cancer and, now, Sophia is fighting cervical cancer. I have had to use a lot of my savings to help Joe and his family survive. My home is on the market because I can no longer afford to live here. My only sibling, a sister, has developed a brain tumor. Our family is quite small and there is no one for me to turn to in case of an emergency. Whenever I need Joe, he comes to help. He spent every weekend with his father when he was dying. I don't know what I'd do without him.

Joe has a lot on his shoulders right now. His children, his wife and I all need him. Please consider this when deciding his fate.

Sincerely,

Sandra Foley
507 Surfside Drive
Akron, Ohio 44319

EXHIBIT

E

June 4th, 2007

Honorable Judge John D. Bates
United States District Court Judge
United States District Court
District of Columbia (Washington, D.C.)

Dear Judge Bates,

My name is Sarah Shepherd. I am currently not working and am home raising my two
young children. I am writing this letter on behalf of my dear friend Joe Foley. I have
known Joe for 12 years. Joe's wife, Sophia, and I have been best friends since 1995. I
first met Joe when he and Sophia lived in Clarendon Hills, IL. My husband and I have
stayed close through the last 4 of the Foley's relocations.

Joe has suffered terribly for the past 5 years, both physically and emotionally. Through
all of the accusations, joblessness, relocations, gossip, emotional and financial struggles
of the last 5 years he has maintained his integrity and his faith in God. He is a
remarkable person.

Joe Foley is a wonderful husband. He is loving, kind and forever supportive. Sophia was
diagnosed with cancer in December of 2006. She underwent chemotherapy and radiation
in January and February of 2007. Joe was always by her side. The doctors won't know if
the cancer is in remission until September. Through this myriad of adversity he has
always provided his wife and family with a positive outlook and a stable, wonderful
home.

Joe Foley is a patient, loving father to two sons, Patrick, 11 and Eric, 9. During the
spring, summer and fall, after work, Joe is at the Little League Park or in the field next
door coaching and or playing baseball with his sons. He tutors his children with their
homework He wakes them every morning for school prior to leaving for the train to
work. He tucks his boys in at night. He takes them to mass on Sunday mornings.

As a friend, Joe is special. We have had countless hours of conversation. He is an
excellent listener and a brilliant linguist. He is well-read. He is a moderate when it
comes to politics and a pacifist, when it comes to war. He is a religious man. We have
never had a conflict nor a confrontation, and our families have been together for
countless holidays and week-end gatherings over the years.

Please consider my words when you bring sentence to Joseph Foley. If anyone would
like to speak to me about his character or his integrity I beg them to do so. Joe deserves to
be home with his family and he deserves to continue to earn a living to support his
family. I can be reached at the following:

Sarah A. Shepherd
708.703.7800



MAY 21, 2007

HONORABLE JUDGE JOHN D. BATES
UNITED STATES DISTRICT COURT JUDGE
UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
WASHINGTON, D.C.


DEAR JUDGE BATES;

  MY NAME IS MICKEY SULLIVAN. MY WIFE AND I HAVE BEEN FRIENDS OF THE FOLEY
FAMILY FOR 23 YEARS. WE MET AS NEIGHBORS IN 1984 WHEN BOTH FAMILIES MOVED TO
MARINEER POINTE.

JIM FOLEY BECAME A CLOSE FRIEND OF MINE. HE WAS A MAN OF DEEP CONVICTIONS,
INTEGRITY, HONESTY AND FAIRNESS. JIM'S STRONGEST ATTRIBUTE MAY HAVE BEEN
HIS SENSE OF LOYALTY TO HIS EMPLOYER, FRIENDS, BUT MOSTLY TO HIS FAMILY. JIM
WAS ABLE TO PASS THESE VALUES TO HIS SON JOE. HE WOULD BE PROUD TO SEE HOW
HIS SON EMULATES HIM & FOLLOWS HIS VALUES.

  I HAVE HAD THE OPPORTUNITY TO OBSERVE JOE THRU HIS UNDERGRAD YEARS ,
HIS PART TIME JOB WORKING AS A WAITER, & HIS GRAD SCHOOL YEARS.

  WE HAD THE OPPORTUNITY TO VISIT HIM IN SAVANNA GA, THE SITE OF ONE OF HIS
EARLY POSITIONS. HE EXPLAINED THE COMMODITY MARKET, THE TRADES HE WAS
ABLE TO MAKE & SHIPPING AND STORAGE OF THE GRAIN. HE WAS VERY PROUD OF
WHAT HE WAS LEARNING AND THE PROFIT HE WAS GENERATING FOR HIS EMPLOYER.

  JOE NOW HAS HIS OWN FAMILY. HE IS FOLLOWING HIS DAD'S IDEALS, WIFE AND KIDS
FIRST, PARENTS A STRONG SECOND. THRU JIM'S ILLNESS JOE SPENT AS MUCH TIME AS
HE COULD WITH HIS MOM & DAD. SINCE HIS FATHER DEATH JOE HAS CONTINUED TO
SPEND AS POSSIBLE WITH HIS MOM. I ALSO KNOW HIS WIFE SOPHIA'S SERIOUS ILLNESS
AND THE WELFARE OF HIS CHILDREN PATRICK & ERIC ARE JOE'S BIGGEST CONCERNS.
  I AM PROUD OF JOE FOR THE EFFORT HE IS PUTTING INTO HIS FAMILY.
THANK YOU FOR ALLOWING ME TO SHARE WITH ,YOU WHAT I THINK OF JOE FOLEY
SON, HUSBAND & FATHER.



**EXHIBIT**

G

THANK YOU AGAIN.

JAMES M. SULLIVAN

The Honorable Judge John D. Bates
United States District Court Judge
United States District Court
District of Columbia (Washington, D.C.)

Dear Judge Bates:

As introduction your honor I am Russell Day, Trading Manager and Senior Soy
Analyst for Glencore Ltd, in Stamford, Ct. We are a Swiss based trading
company involved in Crude Oil, Coal, Copper, and Grain trading around the
world. I am responsible for both analysis and strategy for the company as
it relates to Soybeans and Soy Products.

I've had the pleasure to know Joe Foley both professionally and personally
for over 15 years and am happy and proud to write today on his behalf. Our
relationship began as one of Mentor with Joe showing me the ropes of the
business and teaching me the fundamentals which I apply to this day. We
later became friends and I now consider Joe one of my closest confidants.
He is a good man, a loving husband and terrific father. He is deserving of
your leniency in this matter.

I attended Joe and Sophia's wedding in Chicago and was present for the
birth of their first son, Patrick. Our family's have grown together since
that time, and despite some moving around, have remained close. We speak
everyday. Both at the office and at home, Joe has always conducted himself
in the most upright manner. He is forthright and honorable and admired
amongst his peers. His trading acumen is unparalleled in the industry and
he has never needed to cut corners to succeed.

It has been difficult to watch Joe go through the agony of the last few
years. The loss of his father, his wife's cancer, and the shame associated
with federal charges. Later the loss of employment, the crippling legal
expenses and the inevitable plea. The last five years have been more than
enough punishment for one man, and more than most men could carry. But
carry it he has and carry it he will- the rest of his life.

Please use the authority of your position and wisdom of your years to see
that justice here has been served, that Joe has paid his debt. In
sentencing please allow Joe to continue working and supporting his family.
Let a good man be with his wife and to help her raise their sons in a
loving and supportive way. Please give Joe probation.

Sincerely,

Russ Day
Wyckoff, NJ

EXHIBIT

H

June 4, 2007


Honorable Judge John D. Bates
United States District Court Judge
United States District Court
District of Columbia (Washington, D.C.)

Dear Sir,

I have been employed in the grain industry for 41+ years, 33 years in various facility management positions in several locations with my former employer, Continental Grain Co. I am currently Operations Manager for Chicago and Illinois River Marketing based in Milwaukee, WI.

My family and I have moved several times and met a lot of people and have made many friends in and outside of work, which brings me to the reason for this letter. I had the honor and pleasure to work for Mr. Joseph Foley in Milwaukee in the early 90's. I found Joe to be not only an understanding boss but an outstanding manager, an honest and loyal person who goes out of his way for the people who work for and with him. I can see and feel the difference he has made in the morale of our group in the short while he has worked with us. As far as I know there is no one that doesn't respect Mr. Foley as a man and co-worker.

Mr. Foley, I know is also a doting father and loving husband. I can only hope and pray that he will be able to work with us for along time, I also know we will remain friends, forever.

Thank you, for taking time to read this letter, I would not do this for just anyone but this is from my heart.

Sincerely,

Richard Blaylock

EXHIBIT
I

Judge John D. Bates
United States District Court Judge
United States District Court
District of Columbia (Washington, D.C.)

May 23, 2007

Dear Judge Bates,

I am writing to you on behalf of Joe Foley. His family and mine have been very close friends for over nineteen years. He is an intelligent, well educated man who has much to contribute. My wife, Ann, and I know him to be a caring family man. Recently his father died leaving his widowed mother for him to care for.

This year, Joe's wife came down with cancer and she has just been given chemotheraphy. Joe is sorely needed by his sick wife and their two young sons.

Respectfully,

Thomas Manchester

Thomas Manchester, M.D.
95 Skidaway Island Road
Cottage # 27
Savannah, Georgia  31411

EXHIBIT
J



**Chicago & Illinois River Marketing, LLC**
*A wholly-owned subsidiary of Nidera, Inc.*
*141 W. Jackson Blvd., Suite 2820*
*Chicago, IL    60604*
*Tel. (312) 341-3174 * Fax. (312) 347-4812*

Honorable Judge John D. Bates                                    June 9, 2007
United States District Court Judge
United States District Court
District of Columbia (Washington, D.C.)

Dear Judge Bates,

I am an agriculture executive with 30 years experience and widely recognized as the voice of the industry on the issue of market performance. I manage a business that operates the largest grain facility "regular" for delivery for all commodities at the CBOT that can have a direct impact on market efficiency and has an implied responsibility to take proactive steps to aide market performance. I am Vice-Chairman of the National Grain & Feed Association and I represent the industry on the CFTC Ag Advisory Committee. I am writing today on behalf of Joseph Foley, a long-term colleague that joined our firm as Trading Manager after he resolved his charges with the Commodity Futures Trading Commission.

I have known Joe Foley from the time he entered the grain business as a trainee for Continental Grain Company where I held senior trading & executive positions. I have witnessed Joe's career as he moved from trainee to junior trader, facility manager, and senior trader. As an active member of the industry and a member of NGFA Executive Committee, I have been able to gain insight from industry competitors & customers; including the most senior executives at Continental Grain & ADM and the universal view in the grain industry is that Joe Foley is a quality individual with tremendous trading ability and strong moral character.

His professional skills, his character and his reputation were well known when I first tried to hire Joe as Trading Manager 3 years ago. What I have learned since then has been even more impressive. I have watched Joe handle the professional embarrassment & financial burden following the public notification of the CFTC charges and the subsequent loss of employment. After resolving those charges, I watched as he responded to the life threatening illness of his wife and later notification of Federal charges related to the issue he thought he resolved with the CFTC. What I have seen is a man who was close to breaking…but didn't, and through it all he never lost sight of what was important.

I can't comment on the charges before Joe, but I can say with absolute certainty that he is an even a better man because of this difficult experience. He has a better appreciation for life and a profound commitment to business ethics. I am confident that Joe's experience

**EXHIBIT**
K
tabbies

will make him even more dedicated to honor our company's implied responsibility to aide market performance.

You have Joe's future and the future of many people; his family and co-workers, in your hands. Please do not take him away from the people that count on him. He has been away from his children too much during the job transition, the health of his wife will not be known with any certainly for some time, and his co-workers depend on him. I urge you to recognize the restitution that Joe has already paid the CFTC and let him put this unfortunate episode behind him with the confidence that justice has been served.

Sincerely,

Thomas P. Coyle
Thomas P. Coyle
Vice President & General Manager