HONORABLE JOHN D. BATES, UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Docket No.: <u>CR-07-062-01</u> |
| vs. | : | |
| FOLEY, Joseph | : | Disclosure Date: <u>May 23, 2007</u> |

**FILED**

**JUL 0 6 2007**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## RECEIPT AND ACKNOWLEDGMENT OF
## PRESENTENCE INVESTIGATION REPORT

This is to acknowledge that each of the undersigned has received and reviewed the Presentence Investigation Report (PSR) in the above-entitled case. The undersigned further acknowledges that:

### For the Government
(CHECK APPROPRIATE BOX)
( )  There are no material/factual inaccuracies therein.
( )  There are material/factual inaccuracies in the PSI report as set forth in the attachment herein.

_____     _____
Prosecuting Attorney                                    Date

### For the Defendant
(CHECK APPROPRIATE BOX)
( )  There are no material/factual inaccuracies therein.
( )  There are material/factual inaccuracies in the PSI report as set forth in the attachment.

_____     _____
Defendant              Date              Defense Counsel            Date

## NOTICE OF OBLIGATION OF THOSE EXECUTING THIS FORM

Pursuant to Local Rule 32(f)(2), those executing this form shall first submit any material inaccuracies or disputes in writing by <u>June 6, 2007</u>, to U.S. Probation Officer **Monica Johnson**, telephone number <u>(202) 565-1332</u>, fax number <u>(202) 273-0242</u>.

Pursuant to Rule 32(b)(6)(B), effective December 1, 1994, it shall be the responsibility of the Attorney for the Government and the Defense Counsel to provide each other with a copy of the objections at the same time the objections are filed with the probation office.

**FOR THE COURT**

By:  Gennine A. Hagar, Chief
     United States Probation Officer

# TERRENCE A. GRADY & ASSOCIATES CO., L.P.A.

*a legal professional association*

Telephone: 614/849.0378
Facsimile: 614/849.0379
Email: tgrady@tgradylaw.com

June 6, 2007

**VIA FACSIMILE 202/273-0242**

Ms. Monica Johnson
United States Probation Officer
U.S. Probation Office
United States District Court
for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

RE:  United States v. Joseph Foley
     Case No. CR-07-062-01

     Preliminary Comments to May 23, 2007 Presentence Investigation Report ("PSR")

Dear Ms. Johnson:

I write to provide you with our preliminary comments to the Presentence Investigation Report ("PSR") that you prepared and issued on May 23, 2007.[1] In most respects, we believe that the PSR accurately sets forth the nature of the offense conduct, terms of the Plea Agreement, personal history, and application of the advisory federal sentencing guidelines. In paragraph 82 of your report, you indicated you have not identified nor received any information that would suggest that a departure from the proscribed advisory sentencing guidelines pursuant to the sentencing factors and objectives set forth in 18 U.S.C. §3553(a). In this regard, I want to confirm that the practice in your district is like that in other districts in that these factors are presented to the Court by defense counsel via a sentencing memorandum rather than being included in the PSR. If that is not the case, please let me know.

There are a few items in the report that we wish you will consider expanding upon or clarifying or that we believe are factually inaccurate. These are set forth as follows:

1.  In paragraph 16 of your report, you identify that Mr. Foley considered himself a "junior" with knowledge compared to his co-defendants. While that is also an accurate description, a more accurate description would be to describe him as a "novice" compared to the experience of his co-defendants.

2.  In paragraph 21, you set forth the amount of the loss for application of the sentencing guidelines as more than $1M but less than $2.5M. You indicate that this loss amount was derived from the amount of money the defendant received from the employer as a bonus

---

[1] You faxed me a copy of this on Wednesday, May 30, 2007.

Ms. Monica Johnson
June 6, 2007
Page 2

as a result of his criminal actions in the instant offense. While Mr. Foley agreed to use this figure for the loss computation, characterizing that Mr. Foley received over $1M from his employer *as a result of his criminal actions in the instant offense* is a gross misrepresentation. Mr. Foley was entitled to receive this amount, and even more, as a participant in the company's phantom profit sharing plan that it had established. This plan was designed by AEP to be a long term incentive plan out of a cumulative pool of a portion of the company's earnings generated from a wide variety of energy trading such as electricity trading, gas trading, coal trading, and structured long term marketing deals (mostly electricity). While Mr. Foley does not have a precise breakdown of the origin of the revenue contributions to this plan, he estimates that less than twenty five (25%) of the total contributions to this plan came from the entire gas group. Moreover, his desk's contribution of that percentage was fractional and maybe five to ten percent of that from his gulf coast desk. His participation in this plan covered an approximate five year period, beginning in 1999 (but covering him basically from his start date in 1998) through July 2002. Mr. Foley was entitled to just a fraction of one percent (.0015) share of the total amount in the plan.

Mr. Foley was entitled to his total share being paid to him in July 2002. However, instead of taking this cash at that time, he elected to defer the payout to him (and taxation) of the maximum amount of 90% of his share. As a result, only $200,000 of his total share of $2.2M was distributed to him. When Mr. Foley's employment was terminated, AEP refused to pay over and distribute these funds to him. Mr. Foley ultimately had to sue AEP to recover these funds. AEP countersued him. In the middle of the trial, Mr. Foley agreed to a settlement of $925,000. Of this amount, his attorney was entitled to a 25% contingency fee, plus expenses, netting Mr. Foley $685,000.

It is this $925,000 amount, plus the $200,000 amount that was previously distributed to him, that comprises the in excess of $1M used for the loss computation. As set forth on page 2 of the January 30, 2007 Plea Agreement, the parties agreed that the loss in this case could not be reasonably determined. The fact of the matter is that there is no evidence that this false reporting had any affect at all on AEP's earnings or profitability, or that it had any impact on the market price of gas. While the government represented that it could and would have proven some impact on the price of natural gas and an actual loss, this would have been extraordinarily difficult and likely very expensive. As a result, the parties agreed that the court shall use the gain that resulted from the offense as an alternative measure of loss. In this regard, the parties ultimately agreed that the government could prove that the gain to the defendant was approximately $1.2M. This $1.2M is in fact the gross gain to Mr. Foley from this plan.

This alternative computation was for the application of the sentencing guidelines only. It is simply an arbitrary figure in that Mr. Foley (i) did not receive this amount and, more

Ms. Monica Johnson
June 6, 2007
Page 3

importantly, (ii) it has no nexus or connection in any way to any amounts he received or derived as a direct result of the criminality he has admitted he participated in. Regardless of the documented fact that Mr. Foley actually received far less than this amount, the government was not willing to negotiate from this figure. Rather, the government just took the bonuses paid to Baggett and Hoover and the amount distributed to Mr. Foley from the profit sharing plan and used these numbers to determine the potential incarceration exposure of each of these three co-defendants. We need to be very clear that these figures do not represent the "gain" to Mr. Foley as a result of his criminal conduct. To be very clear, this profit sharing amount does not provide any rationale connection to Mr. Foley's criminality or the benefit he derived from engaging in the conduct he did.

This is also very important given the gross disparity between Mr. Foley's exposure by applying the advisory sentencing guidelines as a result of using this figure versus the exposure and actual sentences of his co-defendants, Baggett and Hoover. Because neither Baggett nor Hoover were participants in the profit sharing plan, the government simply used their annual bonuses as the loss computations. These amounts were such that they placed them in the 12-13 adjusted offense level. As a result, Baggett and Hoover both received probationary sentences.

Although admittedly, Mr. Foley was in a supervisory capacity with respect to Mssrs. Baggett and Hoover, Baggett and Hoover were active, integral, and engaged co-conspirators doing exactly what Mr. Foley was doing to carry out this false reporting practice. Hoover was an experienced cash trader whom I understand was engaged in this false reporting in prior positions before he got to AEP. He was intimately involved in the AEP false reporting. Mr. Foley gave Hoover prices and Hoover inserted the volumes related to monthly reporting to IFERC. Although it appears as though Baggett might not have had the trading backgrounds of Hoover and Mr. Foley, he was again very intimately and actively involved in the reporting of the gas dailys on a day to day basis as he was the person who prepared and transmitted the false information. Given Baggett and Hoover's intimate and active involvement in carrying out the conspiracy, it is disturbing that their sentences (applying the advisory guidelines) can place them in such different positions. Clearly, this was not a case whereby their role in this and the entire loss (however computed) was not foreseeable to each of them. *Thus, if the loss computation was readily quantifiable and applied, how would either Baggett or Hoover, with their respective degrees of almost daily and active participation in carrying out this practice, obtain far more lenient sentences per application of the guidelines?*

Finally, there is much reference to the fact that this was Mr. Foley's practice as though he engineered this plan? This again is not the case. This practice of falsely reporting trades to IFERC and Gas Daily was rampant in the industry. Some thirty companies were fined

Ms. Monica Johnson
June 6, 2007
Page 4

and numerous individuals were sued civilly by CFTC and criminally by DOJ or both. This practice begun long before Mr. Foley joined AEP and it was in practice when he got there. Three of his subordinates actually participated in this particular activity at other companies prior to coming to AEP. Mr. Hoover, John Hymel, and John Harris all informed Mr. Foley of their engaging in this practice with their previous employers and how it was common industry practice. While Mr. Foley the supervisor should have more closely scrutinized the situation and stopped this practice, this practice was not designed by him as it has been portrayed by Hoover and Baggett in their respective Sentencing Memorandums.

Furthermore, although Mr. Foley was certainly entitled to these funds, he had to sue his employer, AEP, to receive these funds. As a result of his legal expenses related to that, his legal fees related to defending the CFTC action, and his CFTC fine, the net amount that Mr. Foley ultimately received from the AEP plan was substantially diminished. His actual and documented expenses related to this entire matter to date relating to his attempt to obtain his phantom equity plan share are set forth as follows:

| Amount | Item |
|---|---|
| $885,000 | AEP litigation net settlement of $685,000, plus $200,000 previously distributed from plan. This is based upon a gross settlement of $1,125,000 comprised of $200,000 distributed from the plan to Mr. Foley and $925,000 from this lawsuit settlement. |
| [$350,000] | CFTC fine paid |
| [$232,000] | Legal fees paid to Schottenstein, Zox & Dunn related to AEP case representation |
| [$100,000] | Legal fees paid to Schottenstein, Zox & Dunn for CFTC representation |
| [$ 13,000] | Straus & Boies legal fees |
| [$ 30,000] | Legal fees Boies, Schiller & Flexner |
| [$  1,000] | Legal fees Larson & Nierling |
| [$ 17,000] | Expert witness fees paid through Schottenstein, Zox & Dunn |
| [$ 14,481] | IRA penalty for early withdrawal to pay CFTC fine |
|  |  |
| $757,481 | **Total expenses** |
| $127,519 | **Balance remaining** |

Importantly, the net figure above does not even factor in the federal and state tax liabilities that were paid on the $665,000 settlement amount. Therefore, after paying several hundred thousand dollars of taxes related to this settlement, he will have a substantial loss related to this matter.

Ms. Monica Johnson
June 6, 2007
Page 5

3. For clarification purposes, in paragraph 34, although Mrs. Foley apparently complained to you that she feared she may have throat cancer, she has since been diagnosed by her doctor and it was determined that she does not have throat cancer. Nevertheless, when she was talking to you as a result of her other treatment, she had a severe throat irritation. Obviously, as a result of her medical conditions, she was concerned about that.

4. In paragraph 38 of the report, just to be very clear, Mr. Foley also suffers from psoriasis and he applies a topical ointment that he takes as needed called Psorcon. Also, he takes a hair growth supplement called Finasteride.

5. In paragraph 40, in addition to Mr. Foley paying a fine of $350,000 to the CFTC, Mr. Foley incurred legal fees in connection with defending an action in the amount of $100,000.

6. Although paragraph 43 is accurate regarding Mr. Foley's drinking habits, he did note that as a result of all of these actions against him, that when he does drink, he tends to drink in excess at this point.

7. In paragraph 49, Mr. Foley advises that while he speaks fluent French and also speaks Spanish, he indicated that he does not speak fluent Spanish.

8. In paragraph 51, Mr. Foley has made his employer aware of the pending charges and related potential consequences. His employer is 1000% behind him at the present time and is hopeful that his sentence is such that he can maintain his employment.

9. <u>Financial Condition Set Forth on Pages 10-11</u>.

   Under the "Cash" section, you reference that Mr. Foley has $317,897 in his LaSalle Bank/checking account. Mr. Foley only had that amount at the time he met with you because he had transferred that amount to that account to pay his 2006 federal and state taxes in the amounts of $286,756 and $21,254, respectively (you note this in paragraph 27 of your report). Therefore, his current balance in his checking account is less than $10,000. Further, under the "Cash" section, you list Mr. Foley as having $685,942 of cash from the AEP retirement account. Mr. Foley does not have that balance. Rather, that balance is included in the other cash balances that you have identified.

   Under "Equity and Other Assets" section, you identified a profit from Mr. Foley's sale of his house in Bexley, Ohio at $140,000 as if this is currently an asset. For your information, Mr. Foley sold the house for $600,000 and he purchased the house for $575,000. After paying commissions and paying for mold eradication, Mr. Foley essentially sold the house at a loss (you also need to correct these figures in paragraph 63

Ms. Monica Johnson
June 6, 2007
Page 6

of the report). This $140,000 needs to be eliminated from the balance sheet as this asset has been sold and there were no proceeds from the sale. You apparently used the amount of his mortgage of $460,000 as his purchase price.

Accordingly, Mr. Foley has total assets of approximately $611,576 instead of $1,750,917 as set forth in your report.

10. Under the "Monthly Cash Flow" section, you indicate that Mr. Foley has an interest from IRA's of $1,567. While this is interest that accumulates on a monthly basis, this is not from the IRA accounts.

11. In paragraph 56 of the report, you have a sentence that reads "Additionally, he advised he pays an additional $3,786 for legal fees and his wife's medical expenses." That statement should be deleted.

12. In paragraph 60, you accurately set forth that Mr. Foley depleted his kid's college savings accounts. This money was depleted not to pay the legal fees, but it was depleted to pay the CFTC fine.

Thank you for your consideration of our initial comments to your report. Please contact me if you wish to discuss any of these comments and suggested changes in more detail or if you need any additional documentation or information concerning this. Thank you very much for your prompt attention to and cooperation in this matter. I look forward to talking with you.

Very truly yours,

Terrence A. Grady

TAG:cls

Enclosure
cc:   Joseph Foley
      Robertson Park, Esq., attorney for the government (via facsimile 202/514-0152)